*Supp. 11 Opinion
COLVIN, P. J.
The People appeal from the order of the court below granting respondent’s motion to suppress made pursuant to Penal Code section 1538.5.[1]
I. Statement of Facts
The facts as adduced at the hearing on the suppression motion are as follows.
The Democratic National Convention was held in San Francisco during July 1984. On July 19, presidential candidate Senator Gary Hart was staying in the St. Francis Hotel in San Francisco. Special Agent Poggi of the United States Secret Service was assigned as the “lead advance agent” for the detail assigned to protect Hart. Hart planned to walk from his hotel to the Meridien Hotel to meet Vice President Mondale. This event was public, but the fact that Hart was going to walk, and shake hands along the way, was not.
The chief witness at the suppression hearing was Special Agent Poggi, who was assigned to guard presidential candidate Senator Gary Hart on July 19, 1984, in San Francisco. Agent Poggi had nine years experience in the Secret Service at the time of this incident. He had a standard operating procedure he was trained to use when assigned to protect a public figure who would be shaking hands on a “rope line.”[2] This procedure involved conducting searches of persons in the crowd.
The search was a light patdown search, and the persons to be searched were chosen in two ways. A general search was done on all persons two or *Supp. 12 three people deep into the crowd. A target search was done on persons anywhere in the crowd who seemed “suspicious” to the agent.

The General Search

Poggi testified that when his protectee was about to shake hands on a rope line, Poggi would go behind the barricade, or line, and search the first two or three people-deep in the crowd for weapons around the waist. He has done thousands of these types of searches. “[Ujsually it’s just a general frisk wherein the people don’t even actually know they are being searched for weapons.” “The public would be between myself and the protectee. I would be behind the public, moving up. And just basically moving them by putting my hands on their waist and saying ‘Excuse me’ and as I move them I would sweep around their waist and go on to the next person.”
At the request of respondent’s counsel, this search was demonstrated to the court by Poggi. The court gave the following description of the search: “It appears that the agent walked up behind [respondent’s attorney], put both hands one on each side at approximately around the waist area, and moved her to the side when he was saying ‘Excuse me’ ... I think he said ‘Excuse me, step aside,’ words to that effect. And at the same time it appears that—and she was moved to his left. And at the same time the agent apparently, from my observation, put your left hand behind the back.” Counsel for respondent noted, in addition, that the left hand continued a sweeping movement around the entire waist which moved her jacket aside slightly as it happened. The agent’s body made contact with her right shoulder as he passed by.
Poggi testified that he has had reactions to this search, but not violent ones; in his opinion the search was not offensive to most people.

The Target Search

The target search was the identical waistband search, again usually done without the subject’s awareness of the search, but performed on a person targeted by the Secret Service agent as a suspicious person in the crowd.
At 10:30 a.m. on July 19, Agent Poggi left the St. Francis Hotel by the Post Street exit. Post Street was blocked off to the public, but 50 to 75 people were gathered behind metal police barricades on Powell. Senator Hart was five minutes behind Poggi.
As Poggi looked toward the crowd of people on Powell Street, he saw respondent, who was about 50 to 75 feet away. Poggi’s attention was at first *Supp. 13 drawn to respondent because of a physical similarity between respondent and Arthur Bremmer, a man Poggi knew was in jail as a result of his conviction of shooting Governor Wallace in 1972. Respondent’s hair was extremely short, almost shaved.
Poggi approached the crowd on Powell Street with another agent right behind him. He was able to communicate with other agents via an earphone radio system.
As he came closer to where respondent was standing, Poggi noticed that respondent was dressed much more casually than the rest of the crowd, who were wearing slacks or sport coats. Respondent was fidgeting and seemed nervous. He was playing with his hands. Poggi was obviously a Secret Service agent, and in a secured area, but respondent avoided all eye contact with Poggi.
At this point, Agent Poggi made the decision to do a targeted search of respondent for weapons.
Poggi went behind the barricade, alone, to be able to come up behind respondent and search him. He had to move five or six people to get to respondent from the rear. “I did a general search on those people also. Saying ‘Excuse me’ and I put my hand and actually physically moved them and searched them at the same time.”
As he approached respondent, he saw that respondent had a fanny pack on. As Poggi approached respondent, he put his hands lightly on his side and said “Excuse me” as if he was going to move him like everyone else. Poggi’s hands were on what he called respondent’s “love rolls,” and he was touching respondent “very, very lightly.”
Respondent spun right into Poggi’s face; because of the quickness of the spin, Poggi characterized it as violent, although there was no violence in the sense that respondent tried to hit Poggi or snarled. Since Poggi was right up behind respondent, respondent turned into Poggi’s face; respondent did not step forward to get closer to Poggi’s face.[3]
Poggi said “Police Officer. Don’t move. I am going to check you for weapons.”
Poggi at that point squeezed the fanny pack and immediately felt a hard object. After he felt the hard object, he commanded respondent not to move. *Supp. 14 Respondent was not free to leave. Poggi unzipped the fanny pack and saw the handle of a gun. He threw respondent to the ground and covered him with his body. Respondent was subsequently arrested without a warrant.
Respondent subsequently filed a pretrial motion to suppress the gun pursuant to California Penal Code section 1538.5.
The court below found that Agent Poggi had subjective cause to search respondent, but did not find objectively reasonable probable cause. Accordingly, the court below granted respondent’s motion to suppress.[4]
II. Discussion

Scope of Review

The California Supreme Court explained in detail the scope of review on appeal from a section 1538.5 motion in People v. Leyba (1981) 29 Cal.3d 591 [174 Cal.Rptr. 867, 629 P.2d 961]:
[“In the first step the trial court must ‘find the facts’ relating to the challenged search or seizure: e.g., it must decide what the officer actually perceived, or knew, or believed, and what action he took in response. These are traditional questions of fact .... ‘On appeal all presumptions favor the exercise of that power, and the trial court’s findings on such matters, whether express or implied, must be upheld if they are supported by substantial evidence.’
“No less important, however, is the second step of the process. As we observed in [People v.] Lawler [(1973) 9 Cal.3d 156 (107 Cal.Rptr. 13, 507 P.2d 621)], ‘The trial court also has the duty to decide whether, on the facts found, the search was unreasonable within the meaning of the *Supp. 15 Constitution.’ . . . Because ‘that issue is a question of law,’ the appellate court is not bound by the substantial evidence standard in reviewing the trial court’s decision thereon. . . . On that issue, in short, the appellate court exercises its independent judgment.
“This general rule governs the particular instance of evidence obtained as a result of an investigative stop. It is now settled that ‘in order to justify an investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity. Not only must he subjectively entertain such a suspicion, but it must be objectively reasonable for him to do so; the facts must be such as would cause any reasonable police officer in a like position drawing when appropriate on his training and experience [citation], to suspect the same criminal activity and the same involvement by the person in question. [Citations.]
“Applying the Lawler rule to the foregoing analysis, we observe that the first issue to be decided, i.e., whether the officer subjectively entertained a suspicion that there was criminal activity afoot and the person he intended to stop was involved in it, is a question of fact: the officer either did or did not have that suspicion at the time he acted. Under Lawler, therefore, review of a trial court’s finding on that issue is limited by the substantial evidence test. But the next step in the inquiry, i.e., whether it was objectively reasonable for the officer to entertain that suspicion, is a question of law: it implicates the constitutional standard of reasonableness—a standard, as Lawler recognizes, that the appellate courts have the ‘ultimate responsibility’ to administer. It follows that the substantial evidence test does not limit review of this issue, and the appellate court must make an independent determination whether the officer’s suspicion was constitutionally reasonable in the circumstances of the case.”] {Id. at pp. 596-597 [fns. omitted].)
The facts bearing on the legality of the search in this case are undisputed. The trial judge implicitly found on the undisputed facts that Agent Poggi had subjective cause to search respondent. Accordingly, there is no factual issue entitled to a substantial evidence standard of review. This court need only determine whether the facts fit within constitutional restrictions on searches.
The issue to be determined by this court is whether there was in fact an intrusion upon a reasonable expectation of privacy which would trigger a *Supp. 16 Fourth Amendment analysis, and, if there was such an intrusion, whether Agent Poggi had objectively reasonable constitutionally required cause.

Is a Fourth Amendment Analysis Appropriate?

The threshold question for this court is whether respondent had a Fourth Amendment right which was violated when the agent initially touched his waist area with the intent to conduct an around the waist pat search. If that question is answered in the negative, the problem becomes whether the subsequent continuation of that search, which included touching the fanny pack, was in violation of respondent’s rights.
The cornerstone of Fourth Amendment rights is a reasonable expectation of privacy, since the Fourth Amendment protects only those expectations of privacy that society finds legitimate. See Katz v. United States (1967) 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507], holding that the Fourth Amendment does not protect the merely subjective expectation of privacy, but only “one that society is prepared to recognize as ‘reasonable.’” (Id. at p. 361 [19 L.Ed.2d at p. 588].)
Is the expectation of privacy asserted by respondent in the area around his waist one that society recognizes as reasonable? “No single factor determines whether an individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion not authorized by warrant.” (Oliver v. United States (1984) 466 U.S. 170, 177-178 [80 L.Ed.2d 214, 223, 104 S.Ct. 1735, 1741].)
It could be argued that respondent did not have a reasonable expectation of privacy since he chose to place himself in close proximity to a presidential candidate under tight security, and he should have known that he would be subject to strict scrutiny by Secret Service agents. The strong governmental and individual interest in a voting public that has access to its representatives, however, weighs against accepting this argument. Respondent has a right to gather with other members of the public to see and hear his representatives or political candidates.
This court believes that the fact that respondent was in a public place close to Gary Hart is not relevant under the circumstances of this case to the issue of whether respondent had a legitimate expectation of privacy. “An individual who enters a place defined to be ‘public’ for Fourth Amendment analysis does not lose all claims to privacy or personal security. [Citations.] For example, the Fourth Amendment’s protections against. . . unreasonable seizure of effects upon the person remain[s] fully applicable.” (Id. at p. 179 [80 L.Ed.2d at p. 225].) “[T]he Fourth Amendment protects *Supp. 17 people—and not simply ‘areas’—against unreasonable searches and seizures.” (Katz v. United States, supra, 389 U.S. at p. 353 [19 L.Ed.2d at p. 583].) “Unquestionably petitioner was entitled to the protection of the Fourth Amendment as he walked down the street in Cleveland.” (Terry v. Ohio (1968) 392 U.S. 1, 9 [20 L.Ed.2d 889, 899, 88 S.Ct. 1868, 1873].)
And accordingly, this court finds that respondent had a reasonable expectation of privacy which was intruded upon when Agent Poggi touched his waist area. This initial “very light” touch was sufficient to trigger respondent’s Fourth Amendment rights.[5]

The Balancing Test: Given the Government’s Interests and the Amount of Intrusion, What “Cause” is Constitutionally Required?

Where a reasonable expectation of privacy exists, the Fourth Amendment prohibits unreasonable searches and seizures by federal law enforcement officers.[6] This restriction is applicable not only to police officers, but *Supp. 18 also to governmental activity in general. (New Jersey v. T.L.O. (1985) 469 U.S. 325, 335 [83 L.Ed.2d 720, 730, 105 S.Ct. 733, 740].) “The basic purpose of this Amendment ... is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.” (Camara v. Municipal Court (1967) 387 U.S. 523, 528 [18 L.Ed.2d 930, 935, 87 S.Ct. 1727, 1732].)
If a legitimate privacy interest is intruded upon by the government, then the Fourth Amendment requires a balancing of interests: given the totality of the circumstances, was the search justified? “Justification” is not a constant, but rather is a variable; depending on the weight of the government’s interests, the weight of the individual’s privacy interests, and the extent, or nature and scope, of the intrusion, varying amounts of justification are necessary. This balancing test has been set out many times by the U.S. Supreme Court. “[I]n determining whether the seizure and search were ‘unreasonable’ our inquiry is a dual one—whether the officer’s action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.” (Terry v. Ohio, supra, 392 U.S. at pp. 19-20 [20 L.Ed.2d at p. 905].) There is “no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails.” (Camara v. Municipal Court, supra, 387 U.S. at p. 523, 536-537 [18 L.Ed.2d 930, 940].) Whether a search is reasonable “depends on the context within which a search takes place. The determination of the standard of reasonableness . . . requires ‘balancing the need to search against the invasion which the search entails.’” (New Jersey v. T.L.O., supra, 469 U.S. at p. 337 [83 L.Ed.2d at p. 731], citing Camara v. Municipal Court, supra, 387 U.S. 523.) Frequently, the result of this balancing analysis has been the finding that a suspicion meeting the level of probable cause is required in order to justify the search or seizure. In certain instances, probable cause is not required, and a reasonable suspicion will suffice. (New Jersey v. T.L.O., supra, 469 U.S. at p. 340 [83 L.Ed.2d at p. 734], citing Terry v. Ohio, supra, 392 U.S. 1 and other federal cases.) “Where a careful balancing of governmental and private interests suggests that the public interest is best *Supp. 19 served by a Fourth Amendment standard of reasonableness that stops short of probable cause, we have not hesitated to adopt such a standard.” (Ibid.[7] See also Florida v. Royer (1983) 460 U.S. 491 [75 L.Ed.2d 229, 103 S.Ct. 1319].) “The predicate permitting seizures on suspicion short of probable cause is that law enforcement interests warrant a limited intrusion on the personal security of the suspect. The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer’s suspicion in a short period of time. [Citations.] It is the State’s burden to demonstrate that the seizure it seeks to justify was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.” (Florida v. Royer, supra, 460 U.S. at p. 500 [75 L.Ed.2d at p. 238].)
Accordingly, even if the search in question is an exception to the rule that probable cause and a warrant are required, then in addition to at least reasonable suspicion, the scope of the search must be strictly limited in scope “to that which is justified by the particular purposes served by the exception.” (Florida v. Royer, supra, 460 U.S. at p. 500 [75 L.Ed.2d at p. 238].)

The Government Interest

“Applying these principles to this case, we consider first the nature and extent of the governmental interests involved.” (Terry v. Ohio, supra, 392 U.S. at p. 22 [20 L.Ed.2d at p. 906].) In Terry, the governmental interests were those of crime prevention and detection and the “more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him.” (Id. at p. 23 [20 L.Ed.2d at p. 907].)
The government’s interest in the present case likewise was a safety interest. Agent Poggi’s job was to protect Senator Hart. Senator Hart, as a presidential candidate, was in a position of special risk. This country has *Supp. 20 witnessed, particularly in recent years, many assassinations and attempted assassinations both of presidential candidates and Presidents.
Prior to the Civil War, none of 15 Presidents was assassinated.[8] Since that time, 4 of 24 presidents have been assassinated. If successful and unsuccessful attempts made on the lives of presidential candidates and presidents are included, the pattern becomes more alarming.[9]
In 1963, John F. Kennedy was shot and killed with a rifle in Dallas, Texas, by Lee Harvey Oswald. On June 5, 1968, Robert F. Kennedy was shot and killed with a pistol in Los Angeles, California, by Sirhan Sirhan. On May 15,1972, George Wallace, giving a campaign speech in a shopping center in Laurel, Maryland, was shot and paralyzed from the waist down by Arthur Bremmer. On September 5, 1975, there was an assassination attempt on President Gerald Ford in Sacramento by Lynette “Squeaky” Fromme. On September 22, 1975, another attempt on President Ford’s life was made by Sara Jane Moore in San Francisco. On March 30, 1981, an attempt was made on President Reagan’s life by John Hinckley in Washington.
In light of this history we cannot blind ourselves, any more than the Terry court could, to the need of law enforcement officers to protect office seekers from violence in situations where they lack probable cause to arrest.[10]
*Supp. 21 “The wide attention the President receives makes him a logical target— if anything about an assassination act can be said to be logical—for those wishing to punish a nation, to strike out at a symbolically powerful figure whom they project as the source of their grievances, to drastically alter governmental policy, or to draw attention to themselves as the author of a memorable event. In addition, the current methods [personal appearances on the campaign trail] by which presidential candidates seek nomination and election provide many opportunities for assassins.”[11] The presidency is the focus of public attention, and those who seek that high office symbolize that office.
The election process, and every adult citizen’s right to vote for one’s representatives must be preserved and protected. The free election process is protected when its participants are kept safe.
Here, not only was there a general government interest in crime prevention and detection, but there was also a more immediate interest in preserving the election process and in the safety of Senator Hart and the general public in the crowd. This constitutes a substantial government interest.

The Private Interest

Since there exists a substantial governmental interest which justified the initiation of some kind of search, this court must ask whether the least intrusive means available was used to safeguard this interest. “The scope of the search must be ‘strictly tied to and justified by’ the circumstances which rendered its initiation permissible.” (Terry v. Ohio, supra, 392 U.S. at p. 19 [20 L.Ed.2d at p. 904] citing Warden v. Hayden (1967) 387 U.S. 294, 310 [18 L.Ed.2d 782,794, 87 S.Ct. 1642, 1652].) Thus, an individual’s interest is directly proportional to the scope and intrusiveness of the search. The smaller the intrusion, the less weight the individual’s interest is given in Fourth Amendment balancing.
When the United States Supreme Court decided Terry .v. Ohio, supra, 392 U.S. 1, it rejected the idea that the Terry-type stop and frisk was a minimal intrusion: “[I]t is simply fantastic to urge that [a careful exploration of the outer surfaces of a person’s clothing all over his or her body in an attempt to find weapons] performed in public by a policeman while the citizen stands helpless, perhaps facing a wall with his hands raised, is a ‘petty indignity.’ It is a serious intrusion upon the sanctity of the person, *Supp. 22 which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly.” {Id. at pp. 16-17 [20 L.Ed.2d at p. 903],)1 **********[12]
In the present case, the intrusion amounted to a very light touch around the waist, similar to a touch any person in the crowd might have inflicted on respondent. While this is irrelevant to the issue of whether respondent had a reasonable expectation of privacy, it is crucial to the question of intrusiveness. The touch was minimal. The agent testified that he had never had adverse responses to the around-the-waist search he used, and that it was especially planned so that it would not bother the people who received it.

The Standard for Constitutionally Required Cause

This court’s conclusion, and evaluation of the proper balance, is that in these circumstances the governmental interest is of sufficient magnitude, and the intrusion on respondent’s privacy is sufficiently minimal, so that only a reasonable belief, not rising to the level of probable cause, would justify the initial pat-search.

Did Agent Poggi Articulate Sufficient Factors to Support an Objectively Reasonable Belief That Respondent Was Armed?

Courts have long wrestled with the amorphous concept of constitutional cause, whether it takes the form of probable cause or reasonable belief. Out of a constantly evolving line of cases have arisen a few standards which guide us today.
To begin with, it is the totality of the circumstances which must be considered. (Illinois v. Gates (1983) 462 U.S. 213, 230-231 [76 L.Ed.2d 527, 543-544, 103 S.Ct. 2317, 2328].)[13]
*Supp. 23 The agent listed several factors which produced his decision to do this target search: the agent’s nine years of experience in this type of situation, respondent’s refusal to make eye contact, casual dress and extremely short haircut, and fidgeting and nervousness. Agent Poggi also testified that he knew Senator Hart was approximately five minutes behind him.
Experience of the officer is an appropriate consideration in many cases. “Circumstances and conduct which would not excite the suspicion of the man on the street might be highly significant to an officer who had had extensive training and experience.” (People v. Superior Court (Kiefer) (1970) 3 Cal.3d 807, 827 [91 Cal.Rptr. 729, 742, 478 P.2d 449]. See also In re Tony C. (1978) 21 Cal.3d 888, 893 [148 Cal.Rptr. 366, 372, 582 P.2d 957]; People v. Brown, supra, 169 Cal.App.3d at p. 165.)
Agent Poggi worked for the Secret Service, a federal agency whose clearly enumerated, specific duties have included the protection of United States Presidents since 1901. In 1968, the agency’s duties were expanded to include protection of presidential candidates. Agent Poggi also testified that he had worked over 16,000 hours in the role of an agent protecting designated protectees, and that his formal training included 16 weeks in Secret Service schools in addition to on-the-job training. He testified that in Secret Service school most of the training was for protection, and that in-service training included assassination-prevention training. Agent Poggi had reviewed this assassination-prevention training immediately prior to the 1984 campaign.
Given Agent Poggi’s extensive training for this type of situation, were the factors he enumerated as the basis for his suspicion sufficient to render the suspicion reasonable?
*Supp. 24 In many cases, refusal to make eye contact, has been expressly rejected as a “probable cause” factor. For example, in People v. Loewen, supra, the court said: “Another factor Deputy Cozart relied on to justify the detention was that the occupants of the truck looked away when they approached. Cozart testified that their failure to continue looking at him was suspicious because ‘[mjost people have a habit of looking at a patrol car when they pass it.’ However, he admitted that neither man attempted to hide his face or otherwise conceal his identity as the truck passed.” (35 Cal.3d 117, 126.) The facts of the case at bar are distinguishable, however. Here, Special Agent Poggi was not merely in a car on the freeway; he looked directly at respondent, got as close as two feet from respondent, and was obviously a Secret Service agent. In People v. Brown, supra, 169 Cal.App.3d 159 [215 Cal.Rptr. 101], refusal to look the officer in the eye was, in combination with other criteria, a valid consideration in the formation of objectively reasonable probable cause to arrest.
Likewise, nervousness, or fidgeting, have met with skepticism on the part of courts when proposed as elements of probable cause. Taken in conjunction with other articulable factors, however, these factors can be important. “While it is true that, taken in isolation, running down the street or the manifestation of nervousness in the presence of a police officer would not constitute adequate grounds to detain a citizen on the street, the combination of circumstances here amounts to considerably more.” {People v. Brown, supra, 169 Cal.App.3d at p. 164, italics added.) In that case, manifestation of the defendant’s nervousness included staring at the officer as opposed to avoiding eye contact; his hands were shaking, and he was pale.
Under the combined circumstances of this case, respondent’s refusal to make eye contact with Agent Poggi and his fidgeting were a legitimate part of the formation of a reasonable suspicion.
Here, we find that in the circumstances of this particular case, the suspicion initially entertained by Agent Poggi was reasonable and articulable, sufficient to support the initial, minimally intrusive, waist-pat search commenced by Poggi, although it did not rise to the level of suspicion necessary for a Terry-type frisk-and-detain, or to the level of probable cause to arrest.

Was There Cause to Search the Fanny Pack and Arrest?

Since the initial search of respondent’s waistband area was justified in the opinion of this court, the issue of whether the search of the fanny pack and subsequent arrest of respondent were justified arises.
Respondent’s spinning around would not be a legitimate basis on which to ground the finding of probable cause if there was no justification *Supp. 25 to initially touch respondent. In People v. Loewen, the court pointed out that there is no duty to cooperate with the police: “[A]n ‘individual, unless he or she is properly detained and so notified, is as free to avoid [an] officer as to avoid any other person.’ . . . ‘[A]n outright refusal to cooperate with police officers cannot create adequate grounds for an intrusion which would otherwise be unjustifiable. ... If the right to be free from unjustified detentions is lost merely by seeking to avoid such encounters, then the right is meaningless; . . .’” (35 Cal.3d at p. 128, italics added.)
In the instant case, this court is of the opinion that the initial intrusion was, in fact, otherwise justifiable, rendering the rule enunciated in Loewen inapposite.
Once respondent violently spun around, Agent Poggi’s objectively reasonable suspicion was heightened, not dissipated. At this point, he continued his around-the-waist pat search for weapons, which had been interrupted by respondent’s spin, telling respondent not to move. Respondent was not free to leave. At this stage, Agent Poggi had reasonable cause to detain and frisk for weapons under Terry v. Ohio, supra, 392 U.S. 1: there was a safety risk, and the initial suspicion had increased.
When the agent felt the hard object in the fanny pack around respondent’s waist, he clearly had full probable cause to unzip the fanny pack. The ensuing unveiling of the gun in respondent’s fanny pack gave rise to probable cause to arrest.
III. Conclusion
The setting in which the search and arrest of respondent took place was unquestionably one of very high risk. A nationally known candidate for president of the United States was following less than five minutes behind Agent Poggi. Respondent contends that no man’s life is more precious than any other, and that the Constitution takes priority over the safety of any one person. We agree with that contention. But the magnitude of the risk to the Senator’s life is the issue here. The decision in Terry v. Ohio, supra, 392 U.S. 1, was not a declaration that policemen’s lives are any more valuable than any one else’s, but a recognition that in some circumstances, a policeman may be in a position of magnified risk. Likewise, this court believes that Senator Hart was in a position of magnified risk at the time Agent Poggi undertook the pat search of respondent.
In the absence of precedent for this particular set of circumstances, this court must return to the balancing test analysis set forth in the Fourth Amendment cases cited above. The governmental interest in preventing *Supp. 26 assassinations, or attempted assassinations, was sufficient in light of all the circumstances of this case to justify the pat search of respondent. This limited intrusion is justified by a reasonable suspicion not rising to the level of probable cause, The factors articulated by Agent Poggi—respondent’s nervousness, fidgeting, refusal to make eye contact, and unusual haircut and dress—considered in conjunction with the high crime situation[14] which existed—were sufficient to justify the patdown and search of the fanny pack.
The order granting respondent’s motion to suppress is reversed.
Dossee, J., and Grant, J., concurred.

All code references are to the Penal Code unless otherwise stated. The original complaint charged the violation of section 12025, subdivision (b) as a felony in reliance on the theory that respondent had previously been convicted of a crime against property, specifically, a trespass. Respondent filed a demurrer to the complaint, contending that a trespass was not a crime against property within the meaning of section 12025, subdivision (b). This demurrer, along with a common law motion to suppress the gun, was denied. When respondent’s section 995 motion was heard in superior court, he successfully challenged the previous municipal court ruling that a trespass was a crime against property within the meaning of section 12025, subdivision (b). The case was then remanded to municipal court, and the amended complaint was filed. Respondent moved to suppress the gun under section 1538.5; the municipal court judge refused to hear the motion on the ground that a common law motion to suppress the gun had been heard and denied by a municipal court judge at the time that respondent’s demurrer to the complaint was overruled. Respondent secured a writ of mandate from the superior court, the 1538.5 motion was heard, and this appeal followed.

A “rope line” was described by Agent Poggi as any sort of barricade separating the protectee, here Senator Hart, from the public. The barricades used in this case were metal police barricades.

This spin, or turn, was demonstrated for the trial court at the suppression hearing by Agent Poggi and Agent Dale.

The ruling of the court below was as follows: “(The Court): Well, let me tell you this: This case causes me a lot of concern because I was very impressed by the agent. ... I don’t know how to say this with a straight face, but he should be commended for his action and at the same time—I think he performed a valuable service—at the same time ... he said that was in fact a search. There was no articulable facts to say he knew at the time he searched Mr. Carlson that any crime had been committed or was about to be committed .... For my reasoning, so you can have it reviewed, that’s basically the way I perceive it: The fact that he was nervous and wouldn’t look at the agent and he was fidgety, I think it was, and the fact that he didn’t wear the same kind of clothes, that was—I don’t think that was enough actually objectively from my perspective to justify the search. Maybe a stop and detention or something of that nature as in Tony C., but he actually conducted a search. And so my perception of it is that based upon the overall context of the matter I don’t think there was enough to justify the search. I don’t know how to say that . . . from an individual perspective and from the Constitutional perspective, I don’t think there was enough to justify the search.”

This court has also considered the notion that respondent’s waist area was, after a fashion, in plain view; that is, that it could be said that since any member of that crowd could have felt respondent’s waist area, and it was arguably foreseeable that someone in the crowd would bump up against respondent and feel the area around his waist, then Agent Poggi’s touch was limited to areas in “plain view,” accessible by members of the public. The plain view doctrine has a requirement of inadvertence, however, which was not met here.
Additionally, the People argue, inter alia, that no search was involved here until after respondent spun around. In other words, the touching of respondent’s waist area was not a “stop” or “detention” but was a mere “contact,” which did not implicate Fourth Amendment rights. Here, had all gone according to Poggi’s usual routine, there would have been no detention, since the Secret Service’s practice in this “rope line” situation was to touch without detaining. The People argue that what Poggi did in touching respondent’s “love rolls” was something that any citizen in the crowd might have done. The California Supreme Court has been explicit as to the rule on this, however. “If the individual is stopped or detained because the officer suspects he may be personally involved in some criminal activity, his Fourth Amendment rights are implicated and he is entitled to the safeguards of the rules set forth above. But similar safeguards are not required if the officer acts for other proper reasons .... such as giving aid to persons in distress, mediating domestic quarrels, assisting the elderly or the disabled, [etc.]” (In re Tony C. (1978) 21 Cal.3d 888, 895 [148 Cal.Rptr. 366, 370, 582 P.2d 957].) The prosecution has the burden of proof if it contends that a stop or detention was for a purpose other than to investigate the defendant as a suspect in criminal activity. {Id. at p. 896.) This burden was not met. Here, the testimony of Agent Poggi shows that respondent was the target; he was approached because he was suspicious looking. He was not approached for some kind of pleasantry. The fact that Agent Poggi did not intend that respondent be aware of the search does not alter this. The contact in this instance, although slight, was sufficient to trigger respondent’s Fourth Amendment rights under the test set forth in Tony C.

In Terry v. Ohio, supra, 392 U.S. 1, the United States Supreme Court said: “If this case involved police conduct subject to the Warrant Clause of the Fourth Amendment, we would have to ascertain whether ‘probable cause’ existed to justify the search and seizure which took place. However, that is not the case. We do not retreat from our holdings that the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure, see, e.g., Katz v. United States, 389 U.S. 347 [19 L.Ed.2d 576, 88 *Supp. 18 S.Ct. 507] (1967); Beck v. Ohio, 379 U.S. 89, 96 [13 L.Ed.2d 142, 147-148, 85 S.Ct. 223] (1964); Chapman v. United States, 365 U.S. 610 [5 L.Ed.2d 828, 81 S.Ct. 776] (1961), or that in most instances failure to comply with the warrant requirement can only be excused by exigent circumstances, see, e.g., Warden v. Hayden, 387 U.S. 294 [18 L.Ed.2d 782, 87 S.Ct. 1642] (1967) (hot pursuit); cf. Preston v. United States, 376 U.S. 364, 367-368 [11 L.Ed.2d 777, 780-781, 84 S.Ct. 881] (1964). But we deal here with an entire rubric of police conduct—necessarily swift action predicated upon on-the-spot observations of the officer on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure. Instead, the conduct involved in this case must be tested by the Fourth Amendment’s general proscription against unreasonable searches and seizures.” (Id. at p. 20 [20 L.Ed.2d at p. 905] [fn. omitted].) Likewise, the conduct of Agent Poggi must be tested under the analysis used for unreasonable searches and seizures.

The New Jersey case, supra, 469 U.S. 325, dealt with the issue of the Fourth Amendment standard to be used in searches of students in a high school, and held that only reasonable suspicion, not probable cause, was required of school officials who searched the students. “By focusing attention on the question of reasonableness, the standard will spare teachers and school administrators the necessity of schooling themselves in the niceties of probable cause and permit them to regulate their conduct according to the dictates of reason and common sense. At the same time, the reasonableness standard should ensure that the interests of students will be invaded no more than is necessary to achieve the legitimate end of preserving order in the schools.” (Id. at pp. 343-344 [83 L.Ed.2d at pp. 735-736].)

In 1835, there was an attempted shooting of Andrew Jackson by Richard Lawrence in Washington, D.C., but the gun misfired. (8 Kirkham et al., Assassins and Political Violence, A Report to the National Commission on the Causes and Prevention of Violence (1969).)

“[T]he presidency has been the object of a disproportionate number of the assassination attempts directed against officeholders in the United States.” (Kirkham, op. cit. supra, at p. 49.)
1835: attempt on Andrew Jackson.
1865: Abraham Lincoln killed.
1881: James Garfield killed.
1901: William McKinley killed. In response to this assassination, the Secret Service was given the new responsibility of protecting the president.
1912: attempt on candidate Theodore Roosevelt.
1933: attempt on Franklin D. Roosevelt three weeks prior to inauguration.
1950: attempt on Harry S. Truman.
1963: John F. Kennedy killed.
1968: Robert Kennedy killed.
1972: attempt on George Wallace.
1975: two attempts on Gerald Ford.
1981: attempt on Ronald Reagan.

Or, as the court put it in Terry v. Ohio, supra, 392 U.S. 1: “Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.
“In view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest.” (Id. at pp. 23-24 [20 L.Ed.2d at p. 907].)

 Assassins and Political Violence, A Report to the National Commission on the Causes and Prevention of Violence, supra, at page 107.

interestingly, in the more recent case of New Jersey v. T.L.O., supra, 469 U.S. 325, the Supreme Court referred to the Terry frisk as a “limited intrusion.” (Id. at p. 337 [83 L.Ed.2d at p. 732].)

There has been some waffling on the part of appellate courts in California as to whether factors add up to more than the sum of their parts or not. The language “whether considered separately or together” appears frequently in appellate opinions, e.g., People v. Aldridge (1984) 35 Cal.3d 473, 478 [198 Cal.Rptr. 538, 674 P.2d 240]; In re Tony C., supra, 21 Cal.3d 888. In People v. Loewen (1983) 35 Cal.3d 117, 128-129 [196 Cal.Rptr. 846, 672 P.2d 436] the court said: “In determining the reasonableness of a detention, this court acknowledges that ‘the totality of the circumstances—the whole picture—must be taken into account. . . .’ [Citation.] [t] . . . [I] In this case, Officer Cozart’s good faith suspicion that the occupants of the truck had engaged in or were about to engage in criminal activity was not reasonable. None of the four factors Cozart testified to [nervousness, increase of thefts in the area, failing to look at officer, speeding up of truck] satisfied the Tony C. test. Nor did they ‘mysteriously become imbued with an aura of guilt merely by viewing them in their *Supp. 23 “totality.”’ [Citation.] To borrow from Justice Mosk, four ‘times zero, in [this court’s] arithmetic, still equals zero.’ [Citation.]”
On the other hand, in People v. Brown, (1985) 169 Cal.App.3d 159 [215 Cal.Rptr. 101], the Court of Appeal held that factors not enough in isolation became sufficient when combined.
“While it is true that, taken in isolation, running down the street or the manifestation of nervousness in the presence of a police officer would not constitute adequate grounds to detain a citizen on the street, the combination of circumstances here amounts to considerably more. [1] Here, the officer saw appellant leave the bank corridor which he knew provided access to the bank only, running at full speed with his head down. Appellant was not jogging but running at full speed in a downtown area, having just left the bank. As appellant came near and looked up and saw the officer, he immediately stopped running, began walking at a fast pace and continued to stare at the officer. He began.turning pale and his hands began to shake. Appellant’s reaction to the officer was extreme. The officer had never seen anyone react that way to him merely upon seeing the officer. . . .” (Id. at p. 164.)
And in People v. Superior Court (Kiefer) (1970) 3 Cal.3d 807, 827 [91 Cal.Rptr. 729, 478 P.2d 449] the court said that “‘[e]ach case must be decided on its own facts and circumstances . . .—and on the total atmosphere of the case. . . .’” citing People v. Ingle (1960) 53 Cal.2d 407, 412 [2 Cal.Rptr. 14, 17, 348 P.2d 577].

See footnotes 9, 10, 11 and accompanying text.