

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-17-2000

# United States v. Ubiles

Precedential or Non-Precedential:

Docket 00-3091

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

## Recommended Citation

"United States v. Ubiles" (2000). *2000 Decisions.* Paper 169.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/169

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 17, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-3091

UNITED STATES OF AMERICA

v.

KAHLI* UBILES, Appellant

*Caption amended per Court's order of June 9, 2000

On Appeal From the District Court of the Virgin Islands
Division of St. Thomas and St. John
(D.C. Crim. No. 98-cr-00143)
District Judge: Honorable Thomas K. Moore

Argued: June 15, 2000

Before: BECKER, Chief Judge, ALDISERT, Circuit Judge
and O'KELLEY, District Judge.**

(Filed August 17, 2000)

          PAMELA L. WOOD, ESQUIRE
           (ARGUED)
          Office of Federal Public Defender
          P.O. Box 1327
          St. Thomas, United States Virgin
          Islands 00804-1327

Counsel for Appellant

_____

** Honorable William C. O'Kelley, United States District Judge for the
Northern District of Georgia, sitting by designation.

JAMES A. HURD, JR., ESQUIRE
United States Attorney
KIM L. CHISHOLM, ESQUIRE
 (ARGUED)
Assistant United States Attorney
5500 Veterans Drive, Suite 260
Charlotte Amalie, United States
 Virgin Islands 00802-6424

Counsel for Appellee

OPINION OF THE COURT

BECKER, Chief Judge.

Kahli Ubiles unlawfully possessed an unregistered firearm while attending a crowded street festival in St. Thomas. Acting on an anonymous tip that Ubiles possessed a gun, local authorities also in attendance stopped and frisked him. The authorities' "Terry" search proved fruitful, and they seized the firearm and arrested him. The United States subsequently filed an indictment against Ubiles, who unsuccessfully moved to have the gun suppressed on the ground that it was seized unlawfully. A jury acquitted Ubiles of a federal charge and convicted him of the possession of an unregistered firearm, in violation of V.I. CODE ANN. tit. 14, S 2253(a). This appeal followed.

Holding that the search and seizure of Ubiles was unlawful, we will reverse. The Terry stop in this case was not supported by reasonable suspicion "that criminal activity [was] afoot . . . ." Terry v. Ohio, 392 U.S. 1, 30 (1968). First, it is not a crime to possess a firearm in the Virgin Islands--even when standing in a crowd. Second, the anonymous tipster who approached the authorities had said nothing that would indicate that Ubiles possessed the gun unlawfully (e.g., without registration); that he was committing or about to commit a crime; or that he posed a threat to the officers or anyone in the crowd. Therefore, the stop and subsequent search were unjustified because the precondition for a Terry stop was not present in this case. In reaching this conclusion, we reject the Government's

contention that Ubiles had a lessened expectation of privacy because he was standing in a crowd. We will therefore vacate the conviction and remand for further proceedings.1

I.

The J'ouvert Carnival is a celebration that periodically takes place in the U.S. Virgin Islands. The carnival celebrates the sunrise, and hence begins before daybreak. J'ouvert festivities last until noon and are typically crowded and boisterous. Hundreds if not thousands of revelers dance in the streets and march in a parade, while local bands lead the procession playing music from a flatbed truck. J'ouvert celebrants often consume a great deal of alcohol.

Virgin Islands Territorial Court Deputy Marshal Franklin Leonard attended the April 30, 1998 J'ouvert Carnival on the Island of St. Thomas. He was off-duty at the time, and was joined by a female friend and two on-duty police officers, Virgin Islands Police Chief Americus Jackson and Virgin Islands Deputy Police Chief Jose Garcia. At approximately 9:00 a.m., an elderly gentleman approached Deputy Marshal Leonard and the officers. Without

_____

1. Our Terry holding obviates the need to reach several other important questions inhering in this case. First, because of our Terry holding, we are able to assume arguendo that the informant's tip in this case was reliable, and therefore, we need not grapple with the fact that the Virgin Islands authorities relied on a face-to-face anonymous tip to stop and frisk Ubiles. Cf. Florida v. J.L., 120 S. Ct. 1375, 1380 (2000) (holding "that an anonymous tip lacking indicia of reliability . . . does not justify
a stop and frisk whenever and however it alleges the illegal possession of firearm"); id. at 1381 (discussing the constitutional difference between
the "anonymous telephone tip" made in J.L.  and an anonymous tip made "face to face") (Kennedy, J., concurring). Second, we do not address Ubiles's argument that the firearm statute under which he was convicted, see V.I. CODE ANN. tit. 14, S 2253(a), as well as a related statute defining certain terms in the firearm statute, see V.I. CODE ANN. tit. 23, S 470, are void for vagueness. Lastly, we do not decide whether the District Court erred in admitting at trial certain incriminating statements made by Ubiles, and in instructing the jury regarding the Virgin Island's firearm possession statutes.

identifying himself, he told Leonard that there was a young man in the crowd standing on the sidewalk near the sea plane shuttle buildings who had a gun in his possession. The anonymous informant pointed toward the man in question and described his clothing and appearance. The informant did not explain how he knew that the man had a gun. He also did not describe, at the time, anything suspect about the gun or anything unusual or suspicious about the man or his behavior.

Deputy Marshal Leonard, followed by the two officers (but not the tipster), walked over to the young man--the defendant in this case--Kahli Ubiles. According to testimony elicited from Leonard at the suppression hearing, Ubiles exhibited no unusual or suspicious behavior when Leonard approached him or when Chief Jackson began talking to him. Leonard also testified that he could not tell when he approached Ubiles whether Ubiles was carrying any type of weapon. Leonard nevertheless conducted a pat-down search of Ubiles and found in Ubiles's possession a cutlass (or machete) and a loaded gun. The firearm was a Jennings Long Rifle .22 caliber semi-automatic pistol, model J-22. The pistol's serial number allegedly had been obliterated, and evidence adduced at Ubiles's subsequent criminal trial revealed that the firearm was unregistered.

The United States subsequently charged Ubiles with possession of a firearm with an obliterated serial number in violation of federal law, 18 U.S.C. SS 922(k), 924(a)(1)(B); possession of an unregistered firearm in violation of Virgin Islands law, V.I. CODE ANN. tit. 14, S 2253(a); and escape from custody in violation of Virgin Islands law, V.I. CODE ANN. tit. 14, S 661. A federal grand jury returned a three-count indictment on these charges. After the indictment was obtained, the Government successfully moved to dismiss the escape from custody charge.

Before trial, Ubiles moved to suppress certain evidence, including the firearm seized by Deputy Marshal Leonard. At a hearing on this motion, the Government presented no evidence suggesting that Leonard or Officers Jackson and Garcia knew anything about Ubiles other than the information with which the anonymous informant had provided them. Leonard stated that no one had told them

4

anything that would lead them to believe (1) that Ubiles posed a danger to himself, the other officers, or the crowd; (2) that Ubiles had brandished the gun or machete in his possession; or (3) that Ubiles did not have a license to carry the gun in his possession. See App. at 71-73. Leonard testified merely that he was "very concerned about the situation" and therefore stopped and frisked Ubiles. Id. at 65.

Based on this testimony, the District Court denied Ubiles's motion to suppress the J-22 seized from his person. In denying the motion to suppress the firearm, the District Court explained:

> It's the night of--I think I can take judicial notice of--can be some heavy drinking. People are tired.
>
> So the kind of information that was given by the older gentleman to Marshal Leonard, that he had just --pointing out the gentleman, describing the clothes that the defendant was wearing, had a gun, was enough reasonable suspicion for the law enforcement officers, the Chief Deputy, Chief, and Marshal Leonard to go over and question him in an investigative style. Prudent thing to do.
>
> And certainly it turned out to be very prudent in this case for the officers' protection while they were questioning the individual, to pat him down.
>
> And that pat down produced [the J-22].

Id. at 104.

Ubiles's case proceeded to trial. The Government introduced the J-22 into evidence and presented the testimony of Deputy Marshal Leonard; Brenda Mason, a Firearms Certification Officer with the U.S. Virgin Islands; and Ronald Lockhart, the anonymous informant (whose identity the Virgin Islands authorities had discovered shortly before trial). Leonard testified about seizing the weapon from Ubiles. Ms. Mason testified that after a thorough records search of St. Thomas and St. Johnfiles she had not found a firearm license for Ubiles's gun. She also stated that the Firearms Certification Officer for the District of St. Croix had found no such record. Lockhart

5

told the jury that at approximately 8:30 a.m., on April 30, he saw something that looked like a gun pass from another man to Ubiles. He testified that there were three to five minutes between the time he saw the gun and the time he spoke to the officers. However, Lockhart had not related these details to the officers when he gave his tip. He had told Leonard only that he had observed a man with a gun and described and pointed to that man for the officers.

The jury found Ubiles not guilty of the federal charge--possessing a firearm with an obliterated serial number--but guilty of the territorial charge of possessing an unregistered firearm. Ubiles filed a post-trial motion to vacate the conviction, which was denied. The District Court sentenced Ubiles to three years imprisonment, suspending all but six months of the sentence, and to supervised probation for a period of four years and six months.2 This appeal followed. The District Court of the Virgin Islands had jurisdiction under 18 U.S.C. SS 3231, 3241, and 48 U.S.C.S 1612(c). We have jurisdiction pursuant to 28 U.S.C. S 1291. We exercise plenary review of the District Court's decision to deny Ubiles's motion to suppress the firearm in question. See United States v. Hyde, 37 F.3d 116, 118 (3d Cir. 1994).

_____

2. We note that the District Court ordered that Ubiles's term of imprisonment be served consecutive to an unrelated criminal charge on which the Virgin Islands authorities were holding Ubiles. The Virgin Islands statute governing consecutive sentences for the violation of territorial statutes allows for the imposition of sentences "to be served . . . consecutively to any other sentence imposed at the same time or prior thereto." V.I. CODE ANN. tit. 5, S 3672(a) (2000) (emphasis added). Section 3672(a) does not speak of the imposition of sentences "to be served consecutively to any other charge brought  at the same time or prior thereto," nor would it seem appropriate to do so. Until a charge matures into a conviction and then a sentence, a suspect held on that charge is a mere detainee, and not a prisoner of the state serving a sentence in addition to which another sentence could be imposed consecutively. Therefore, the sentence in this case commenced as soon as it was imposed, on February 4, 2000. The sentence accordingly expired on August 4, 2000. However, inasmuch as the non-jail portion of the sentence remains, this appeal is not moot.

II.

The Fourth Amendment prohibits "unreasonable searches and seizures . . . ." U.S. CONST. AMEND IV; see also Harris v. United States, 331 U.S. 145, 150 (1947). "What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." United States v. Montoya de Hernandez, 473 U.S. 531, 537 (1985). The "general rule" is that "warrantless searches are presumptively unreasonable . . . ." Horton v. California, 496 U.S. 128, 133 (1990). The courts have, however, fashioned exceptions to the general rule, recognizing that in certain limited situations the government's interest in conducting a search without a warrant outweighs the individual's privacy interest. See, e.g, id.; Montoya de Hernandez, 473 U.S. at 537–41. A Terry "stop and frisk" is one such exception. See Terry v. Ohio, 392 U.S. 1, 20–22 (1968).

A.

Terry, and cases which follow it, make clear that "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlaw, 120 S. Ct. 673, 675 (2000). To make a showing that he or she in fact had reasonable suspicion, "[t]he officer must be able to articulate more than an `inchoate and unparticularized suspicion or "hunch" of criminal activity.' " Id.  (quoting Terry, 392 U.S. at 27).

A reasonable suspicion of criminal activity may be formed by observing exclusively legal activity. See id.  at 677; see also Terry, 392 U.S. at 22–23. In Wardlaw , for example, the officers who stopped the defendant were able to point to the fact that the defendant was standing in an area known for heavy narcotics trafficking and to the fact that he immediately fled the scene after seeing the officers arrive. See id. at 674. The Court "noted the fact that the stop occurred in a `high crime area' [counts] among the relevant contextual considerations in a Terry analysis." Id. at 676. The Court further noted that headlong flight, while not

7

"necessarily indicative of ongoing criminal activity," id. at 677, was "suggestive" of "wrongdoing," id. at 676. The Supreme Court therefore held that, while both of the defendant's actions constituted legal behavior, they properly gave rise to the inference that criminal activity was afoot, given the totality of the circumstances. See id. at 676-77.

What remained the centerpiece of the Court's analysis, however, was whether the defendant's behavior pointed to the presence of illegal activity. Even though the officers' suspicion was grounded in evidence of purely legal activity, the Court held that the stop was lawful only because the defendant's behavior suggested that criminal activity was afoot. See id. at 676. We conclude Officer Nolan was justified in suspecting that Wardlow was involved in criminal activity, and, therefore, in investigating further.") (emphasis added). Had the defendant not fled on sight of the officers, and simply " `go[ne] about [his] business,' " there would have been no reason to suspect that he was engaged in criminal activity, and the officers would have had no justification to detain him. See id. (citing Florida v. Royer, 460 U.S. 491, 498 (1983)).

Ubiles contends that the stop in this case was not supported by the type of reasonable suspicion required by Terry. He argues that, based on the facts presented to the officers by Lockhart at the J'ouvert Carnival, the officers had no reason to suspect that "criminal activity[was] afoot" at the time they decided to stop him. Terry, 392 U.S. at 30. We agree.

B.

Deputy Marshal Leonard and his compeers had no reason to believe that Ubiles was "involved in criminal activity . . . ." Wardlow, 120 S. Ct. at 676. It is not necessarily a crime to possess a firearm in the Virgin Islands, see V.I. CODE ANN . tit. 23, S 470; nor does a mere allegation that a suspect possesses a firearm, as dangerous as firearms may be, justify an officer in stopping a suspect absent the reasonable suspicion required by Terry, see Florida v. J.L., 120 S. Ct. 1375, 1379 (2000) (rejecting an

8

"automatic firearm exception" to the rule in Terry).
Moreover, while there are ways to possess a gun illegally in
the Territory--such as by possessing a gun with an altered
serial number, see 18 U.S.C. S 922(k), or by possessing an
unlicensed gun, see V.I. CODE A NN. tit. 14, S 2253(a)--the
Virgin Islands legislature has not enacted a criminal statute
prohibiting gun possession in a crowd or at a carnival.
During the suppression hearing the Government adduced
no evidence suggesting that either Leonard or his officer
confreres was aware of any articulable facts suggesting that
the gun Ubiles possessed was defaced or unlicensed, that
Ubiles posed a safety risk to the authorities or the J'ouvert
celebrants, or that Ubiles was acting in a manner indicating
that he was involved in a different crime. For all the officers
knew, even assuming the reliability of the tip that Ubiles
possessed a gun, Ubiles was another celebrant lawfully
exercising his right under Virgin Islands law to possess a
gun in public. That is as much as Lockhart told Leonard
and Officers Jackson and Garcia in pointing to Ubiles and
informing them that Ubiles had a gun in his possession.

This situation is no different than if Lockhart had told
the officers that Ubiles possessed a wallet, a perfectly legal
act in the Virgin Islands, and the authorities had stopped
him for this reason. Though a search of that wallet may
have revealed counterfeit bills--the possession of which is
a crime under United States law, see 18 U.S.C. SS 471-72--
the officers would have had no justification to stop Ubiles
based merely on information that he possessed a wallet,
and the seized bills would have to be suppressed. The
District Court's rationale for not suppressing thefirearm in
this case is troubling, therefore, insofar as it seems to
endorse the stop based on the fruits obtained as a result of
the subsequent search. See Part I (reproducing the District
Court's rationale). This post-hoc justification for stops and
searches has been repeatedly rejected. See, e.g. , Florida v.
J.L., 120 S. Ct. 1375, 1379 (2000) ("The reasonableness of
official suspicion must be measured by what the officers
knew before they conducted their search.").

As with the case of the hypothetical wallet holder, the
authorities here had no reason to know that Ubiles's gun
was unregistered or that the serial number had been

9

altered. Moreover, they did not testify that it is common for people who carry guns in crowds--or crowds of drunken people--to either alter or fail to register their guns, or to use them to commit further crimes--all of which would be additional evidence giving rise to the inference that Ubiles may have illegally possessed his gun or that criminal activity was afoot. Therefore, as with the wallet holder, the authorities in this case had no reason to believe that Ubiles was engaged in or planning or preparing to engage in illegal activity due to his possession of a gun. Accordingly, in stopping him and subsequently searching him, the authorities infringed on Ubiles's Fourth Amendment rights.

Lockhart's in-court testimony during Ubiles's trial does not undermine this conclusion. Lockhart testified at trial about how he saw Ubiles come to possess the gun. He stated that another man surreptitiously handed the gun to Ubiles, and that Ubiles slipped the gun into his pocket. The nature of this exchange could give rise to the inference that Ubiles was not the gun's owner. One could further infer based on this original inference, that, because Ubiles was not the gun's owner, he illegally possessed the gun, for it is illegal to possess a gun in the Virgin Islands that is not registered in your own name. See V.I. CODE ANN. tit. 14, S 2253(a); V.I. CODE ANN. tit. 23, S 470. But there was no testimony introduced at the suppression hearing that Lockhart had told Leonard, before the search, that another man had surreptitiously handed the gun to Ubiles. As noted above, "[t]he reasonableness of official suspicion must be measured by what the officers knew before they conducted their search," J.L., 120 S. Ct. at 1379 (emphasis added); hence the Government cannot rely on this fact in arguing that Lockhart's testimony in this regard is relevant in assessing the constitutionality of the stop in question.3

_____

3. In engaging in the analysis in the three paragraphs above, we intimate no view as to whether this additional hypothetical information would have been sufficient to warrant a finding of reasonable suspicion. The information would represent additional evidence (weighing in favor of a finding of reasonable suspicion) in " `the totality of the circumstances' "
a court must consider in determining whether a stop was reasonable. United States v. Sokolow, 490 U.S. 1, 8 (1989) (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)).

10

C.

Nor can the Government rely on the fact that this stop took place during a crowded festival to make up for the lack of reasonable suspicion present in this case. We decline the Government's invitation to extend to crowds generally the Supreme Court's relaxed search and seizure jurisprudence dealing with close quarters, and the special risks attendant thereto, in airports and schools. In Florida v. J.L., the Supreme Court opined:

> The facts of [Florida v. J.L.] do not require us to speculate about the circumstances under which the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability. We do not say, for example, . . . . that public safety officials in quarters where the reasonable expectation of Fourth Amendment privacy is diminished, such as airports, see Florida v. Rodriguez, 469 U.S. 1 (1984) (per curiam), and schools, see New Jersey v. T.L.O., 469 U.S. 325 (1985), cannot conduct protective searches on the basis of information insufficient to justify searches elsewhere.

120 S. Ct. at 1380.

We believe that neither the heightened safety concerns observed at airports, nor the pedagogical and safety concerns implicated at schools obtain any time a crowd of adults congregates. If that were not the case, citizens farming under the open skies of Washington or Vermont would generally have greater Fourth Amendment protections than their compatriots bustling to work in Manhattan or Boston. As a general proposition of constitutional law, this cannot be so; Terry applies equally in each of these locales.

A California court of intermediate appeals reached a similar conclusion on similar facts:

> This court believes that the fact that respondent was in a [crowded] public [street] close to [presidential candidate] Gary Hart is not relevant under the circumstances of this case to the issue of whether respondent had a legitimate expectation of privacy. . . .

11

> "[T]he Fourth Amendment's protections against unreasonable seizure of effects upon the person remains fully applicable." ([Oliver v. United States, 466 U.S. 170, 179 (1984)].) "[T]he Fourth Amendment protects people--and not simply `areas'--against unreasonable searches and seizures." (Katz v. United States, [389 U.S. 347, 353 (1967)]). "Unquestionably petitioner was entitled to the protection of the Fourth Amendment as he walked down the street in Cleveland." (Terry v. Ohio, 392 U.S. 1, 9 (1968)).

People v. Carlson, 233 Cal. Rptr. 236, 241 (Cal. Ct. App. 1986); see id. at 241 n.5 (also rejecting the argument that because "any member of that crowd could have felt respondent's waist area, and it was arguably foreseeable that someone in the crowd would bump up against respondent and feel the area around his waist, then[the officer's] touch was limited to areas in `plain view,' accessible by members of the public"). We agree with this reasoning.

III.

For the foregoing reasons, the judgment of the District Court will be reversed. The firearm seized from Ubiles should have been suppressed as the fruit of an unlawful seizure.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

12