**GOVERNMENT OF THE VIRGIN ISLANDS, Plaintiff/Appellee,**

v.

**Jack PETERSEN, Defendant/Appellant.**

**No. CRIM. APP.1998/105.**

District Court, Virgin Islands,
Appellate Division,
D. St. Croix.

Jan. 8, 2001.

Jean–Robert Alfred, St. Croix, VI, for Appellant.

Maureen Phelan Cormier, Virgin Islands Dept. of Justice, St. Thomas, VI, for Appellee.

Before: FINCH, Chief Judge, District Court of the Virgin Islands; MOORE, Judge of the District Court of the Virgin Islands; and VERNE A. HODGE,[1] Presiding Judge of the Territorial Court of the Virgin Islands, Sitting by Designation.

## OPINION ON THE COURT

PER CURIAM.

In a jury trial that commenced on May 11, 1998, Jack Petersen was convicted in Territorial Court of negligent homicide. He was sentenced to prison for two years, with all but six months suspended, and ordered to pay a fine of $500.00 by the end of his probationary period.[2] This timely appeal arose out of that September 14, 1998, Judgment and Sentence.

## I. FACTS

On September 16, 1997, Jack Petersen ["Petersen" or "appellant"], an assistant principal at Central High School, was driving south on Route 633 when he struck Carlos Juan Navarro ["Navarro"] less than one-half mile from the Central High School gymnasium. The prosecution made no claim he was anything other than sober. Navarro, a man of small stature (90 lbs., 5'1" tall) who was seriously ill due to a long-term addition to heroin and crack cocaine, died shortly thereafter of a skull fracture. (Appendix ["App."] at 50(96), 51 (97–100).)[3] Petersen's claim that he was

1. The Honorable Verne A. Hodge retired as Presiding Judge of the Territorial Court on November 6, 1999.

2. Appellant was further ordered to abide by standard conditions of probation and to: 1) enroll in and complete a driver's safety course during his probationary period; 2) pay twenty-five dollars in court costs within six months of the Judgment; and 3) make restitution to the victim's family for funeral expenses. The court also ordered that appellant's driver's license be suspended for six months commencing upon release from custody, except for operating a vehicle as part of his drivers safety course.

3. Each page of the Appendix contains four pages of trial transcript, therefore, there are two numbers provided for easy reference. The first number is the page of the appendix,

not speeding is supported by the fact that Navarro's legs were not fractured by the impact, despite the debilitated state of his body. (*See* App. at 60–61 (236–37).)

Petersen was charged with one count of negligent homicide by means of a motor vehicle in violation of V.I. CODE ANN. tit. 20, § 504.[4] Although there was some dispute about what actually occurred, appellant contended at trial that he saw Navarro walking some distance ahead on the opposite side of the dimly lit road, but then focused his attention on the road, and had no reason to expect Navarro to cross in front of his path. Petersen testified that he did not see the victim again until Navarro was right in front of his vehicle and it was too late to avoid hitting him. Petersen's theory of defense was that Navarro stumbled and lurched across the road into his path without warning because he was under the influence of heroin, generally incapacitated, and unable to look out for himself due to long-term drug addiction. The Government of the Virgin Islands ["government"] argued that Petersen had to have seen Navarro staggering across the road, but, nevertheless, operated his vehicle with disregard for the safety of another, and failed to yield the right of way.

This appellate panel is called upon to decide whether the trial court erred (1) in ruling that the results of toxicology tests on blood samples drawn from the victim and submitted to the FBI laboratory were inadmissible hearsay, and (2) not admissible under the public records exception of Federal Rule of Evidence 803(8)(C); and (3) whether the trial court erred in not allowing an expert witness to give an opinion on those toxicology results under Federal Rule of Evidence 703; and finally (4) whether the error was cured when the results came in during the defense's case. For the reasons stated below, we will reverse appellant's conviction, and order that a new trial be held.

## II. DISCUSSION

### A. Jurisdiction and Standards of Review

 This Court has appellate jurisdiction to review judgments and orders of the Territorial Court in all criminal cases in which the defendant has been convicted, other than a plea of guilty. 4 V.I.C. § 33; Section 23A of the Revised Organic Act of 1954.[5] Findings of fact are subject to a clearly erroneous standard of review, and we exercise plenary review over questions of law. 4 V.I.C. § 33; *see Rivera v. Government of the Virgin Islands*, 37 V.I. 68, 73, 981 F.Supp. 893 (D.V.I.App.Div.1997). Admission of evidence and testimony under the Federal Rules of Evidence [6] is discretionary and is reviewed for abuse of

---

and the number in parentheses is the page number within that page.

**4.** The Virgin Islands Code defines the offense of negligent homicide by means of motor vehicle:

> When the death of a person ensues within one year as a proximate result of injury received by the operation of a vehicle by any person while under the influence of or affected by intoxicating liquor or narcotic drugs or by the operation of any vehicle in a reckless manner or with disregard for the safety of others, the person so operating such vehicle shall be guilty of negligent homicide by means of a motor vehicle. Any person convicted of negligent homicide by means of a motor vehicle shall be punished by imprisonment for not more than five

years, or by a fine of not more than one thousand dollars, or by both such fine and imprisonment.
20 V.I.C. § 504. (The Judgment and Sentence of the trial court inadvertently cited 14 V.I.C. § 504 (Child Neglect)). (App. at vi.)

**5.** Revised Organic Act of 1954, § 23A, 48 U.S.C. § 1614, *reprinted in* V.I. CODE ANN., Historical Documents, Organic Acts, and U.S. Constitution at 159–60 (1995) (preceding V.I. CODE ANN. tit. 1).

**6.** *See* TERR. CT. R. 7 ("The practice and procedure of the Territorial Court shall be governed by the Rules of the Territorial Court and, to the extent not inconsistent therewith, by the Rules of the District court …, the Federal Rules of Criminal Procedure and the Federal Rules of Evidence.").

discretion, but, to the extent the trial court's ruling turns on an interpretation of those rules, the review is plenary. *See Gov't of Virgin Islands v. Texido,* 89 F.Supp.2d 680, 683 (D.V.I.App.Div.2000); *Charleswell v. Gov't of the Virgin Islands,* 167 F.R.D. 674, 678 (D.V.I.1996); *Rivera v. Govt. of Virgin Islands,* 635 F.Supp. 795, 798 (D.V.I.1986). Even if such abuse of discretion is found, reversal may be avoided if the error was harmless; a non-constitutional "'harmless error' requires a 'high[ ] probabil[ity] that the evidence did not contribute to the jury's judgment of conviction.'" *Nibbs v. Roberts,* 31 V.I. 196, 223–24 n. 18, 1995 WL 78295 (D.V.I. 1995) (quoting *Government of the Virgin Islands v. Toto,* 529 F.2d 278, 284 (3d Cir.1976)). Denial of a motion for mistrial is reviewed for abuse of discretion. *Accord United States v. West Indies Transport Inc.,* 37 V.I. 579, 598, 127 F.3d 299, 311 (3d Cir.1997); *United States v. Xavier,* 29 V.I. 279, 284, 2 F.3d 1281, 1285 (3d Cir.1993).

**B. Trial Court Erred in Ruling that Report of Results of Toxicology Tests on Blood Samples Government Pathologist Had Drawn from Victim Was Inadmissible Hearsay and that Petersen Could Not Cross-examine Pathologist on the Results.**

The government called the medical examiner for the island of St. Croix, Dr. William A. Fogarty ["Dr. Fogarty"], who was also the director or chief of pathology at the hospital, to testify as an expert in anatomic and clinical pathology. He reported to the jury his findings that Navarro died from a skull fracture, that he had multiple skin ulcers and needle tracks on his body consistent with a narcotic habit, and that he had chronic lung disease. The defense cross-examined Dr. Fogarty on his written autopsy report, which was complete except for the results of the toxicological analysis on the blood samples of the victim which he had drawn at the autopsy and sent to the FBI for toxicological analysis. (*See* App. at 54(109).) Navarro's her-

oin addiction was so advanced that he was very malnourished, almost cachectic, that is, "nearly skeletonized from malnutrition . . . all skin and bones and almost starved to death." (*Id.* at 51–52 (100–01).) Although the medical examiner testified that the needle ulcers on Navarro's skin were only a day or two old, the victim's level of alertness would have depended on when he had received his last "fix". (*Id.* at 51, 52 (98, 102).)

Petersen sought to introduce evidence that Navarro was high on heroin at the time of the accident through the results of the toxicology tests on blood Dr. Fogarty had drawn from Navarro and sent to the Federal Bureau of Investigation ["FBI"] laboratory for analysis. Although the lab had rendered its toxicology report and Dr. Fogarty had reviewed it, the trial judge refused to allow the defense to bring out that the FBI analysis confirming that Navarro had morphine in his blood in a very fresh state at the time he walked in front of Petersen's car.

BY MR. ALFRED:

Q Would [Navarro] be likely to be an alert person?

A Depending upon when they received their last fix. Obviously, if he got a good fix, he would be nodding off and that sort of thing. Between fixes, I would imagine he would be able to carry out some daily activities.

Q You indicated in your report, doctor, that your final diagnosis was pending toxicology.

A That's correct.

Q The toxicology reports, you have seen them, right?

A I have.

Q What do they reveal?

MR. PONTEEN: Objection. . . .

THE COURT: What is your objection?

MR. PONTEEN: Hearsay, Your Honor. If this witness is to indicate the results of someone else's report—

THE COURT: And your response?

MR. ALFRED: Yes, Your Honor, again under the rules of evidence 803(8), we are permitted to doing this. Secondly, under Rule 703, this is an expert witness; he may testify as to items even if they are not admittable into evidence.

THE COURT: Any items?

MR. ALFRED: That's what it says, data or facts which are not admissible into evidence, under 703.

THE COURT: Presuming that he utilize those items to arrive at his conclusion, though. I haven't heard any such foundation laid.

MR. ALFRED: The foundation is, under the public report exception to the hearsay, which is in 803(8), and the fact that this witness—

THE COURT: Come, come, come.

... [AT SIDEBAR]

THE COURT: And you are asking him a question concerning toxicology results that are in this report?

. . . .

MR. ALFRED: Yes, I am seeking to ask him—he said in his last sentence—

THE COURT:—that he was waiting for toxicology reports.

MR. ALFRED: Exactly, the final diagnosis.

THE COURT: And this is the report?

MR. ALFRED: Yes

THE COURT: Which he did not make.

MR. ALFRED: No. The FBI did those.

THE COURT: So why is that not hearsay, then?

MR. ALFRED: Because of Rule 803(8) . . . .

. . . .

THE COURT: Which subsection?

MR. ALFRED: "C." And against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law.

THE COURT: Well, I don't consider that that [sic]. I consider this . . . is not a factual finding based upon an investigation. . . . And I don't consider this to be a record that's a public record or report. The objection is sustained.

MR. ALFRED: May I ask the Court, am I allowed to admit—to inquire whether it's in the report and whether it's consistent with his findings?

. . . .

THE COURT: You could ask him if he utilize[d] it in his report. Which doesn't seem to be the case, from the last statement here.

MR. ALFRED: Yeah, he said pending toxicology report. I wanted to ask him—

THE COURT: You may inquire as to whether or not he utilized it in forming his conclusion. I assume his conclusion was already here. Which means he didn't have it at the time. But if he didn't make this report, you can't ask him about it; he doesn't know anything about conducting any lab test. He is not a lab tech. He deals with dead people. . . .

(App. at 52–53 (103–04, 107–08).) The trial judge thus prevented appellant from confirming through the prosecution's expert that Navarro was still under the influence of a "hit" of heroin injected within six hours of his death when he walked in front of Petersen's car.[7]

### 1. Federal Rule of Evidence 803(8)(C)

 Petersen argues that the trial court erred in ruling that the FBI toxicology report was hearsay, because it clearly satisfied the public record exception to the exclusion of hearsay:

**7.** (*See* testimony of defense expert, John Smialek, MD, *id.* at 61 (237–39), and discussion *infra* II.B.3.)

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (C) ... [,] against the government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

FED. R. EVID. 803(8)(C) (All references to "rule" are to the Federal Rules of Evidence, unless otherwise indicated). Appellant contends that the report should have been admitted under Rule 803(8)(C) because the medical examiner had requested the factual findings of the tests pursuant to his authority to investigate the cause of death and the defendant was offering the report in a criminal case against the government. The government contends that the trial court properly excluded the report because Petersen failed to lay the foundation for its admission, and even if the trial judge erred, the contents of the report were later admitted and the error cured.

The record clearly reflects that the trial judge found that the FBI toxicology report was hearsay and not within the exception of Rule 803(8)(C). "This is not a factual finding based upon an investigation.... And I don't consider this to be a record

that's a public record or report. The objection is sustained." (*See* App. at 53(107).) Contrary to the trial court, we find that all the prerequisites for the admission of the factual findings of the FBI toxicology report as substantive evidence were met: it was a report of a public agency, it was offered against the government in a criminal case, and it was undisputed that its findings resulted from an authorized investigation. *See United States v. Versaint*, 849 F.2d 827 (3d Cir. 1988) (not harmless error for trial court to refuse defense request to admit police officer's report under 803(8)(C) against prosecution as substantive evidence even though defense used report to cross-examine and impeach officer); *United States v. DePeri*, 778 F.2d 963, 976 (3d Cir.1985), *cert. denied sub nom. Pecic v. United States*, 475 U.S. 1110, 106 S.Ct. 1518, 89 L.Ed.2d 916 (1986) (noting that FBI reports come within 803(8)(C) public record exception and are admissible against the government). Since the government made no attempt to show that its findings lacked trustworthiness, the judge was required to admit the factual findings of the report.[8] We hold that the FBI toxicology report was admissible under Rule 803(8)(C) as a factual finding based upon a lawful investigation contained in a public record or report, and that the trial judge's interpretation of the rule was erroneous as a matter of law.

### 2. Federal Rule of Evidence 703

■ Petersen also contends that Dr. Fogarty, an expert witness, should have

---

**8.** *See generally, Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988) ("[P]ortions of investigatory reports otherwise admissible under Rule 803(8)(C) are not inadmissible merely because they state a conclusion or opinion. As long as the conclusion is based on a factual investigation and satisfies the Rule's trustworthiness requirement, it should be admissible ...."); *Clark v. Clabaugh*, 20 F.3d 1290, 1294 (3d Cir.1994) ("Rule 803(8)(C) explicitly excepts public records and reports 'resulting from an investigation made pursuant to authority granted by law,' from exclusion under the hearsay rule, because official reports contain inherent indicia of trustworthiness." Such a

report, with its opinions, conclusions and recommendations, is "presumed admissible," unless the defendant demonstrates its untrustworthiness. And the rule does not "require that the one who undertakes the investigation and authors the report be qualified as an expert before the report becomes admissible.") (citation omitted); and 31 MICHAEL H. GRAHAM, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE, § 6759 (2d ed. 1997) (The scope of Rule 803(8)(C) evidence has been liberally construed to include factual findings of "not only what happened, but how it happened, why it happened, and who caused it to happen.").

been allowed to testify about those reports under Rule 703, even assuming that the toxicology reports were inadmissible hearsay. (*See* App. at 52(103) ("Secondly, under Rule 703, this is an expert witness; he may testify as to items even if they are not admittable into evidence.").) Rule 703 does indeed provide that not all the data an expert relies upon for his opinion must be independently admissible in evidence:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

FED. R. EVID. 703. Dr. Fogarty testified that he had completed his pathology report before receiving the FBI report. When asked if there were any changes to his findings as a result of what he had seen in that report, he responded, "Not really." (App. at 54(110).) The trial judge interpreted the rule to require that the expert must have actually considered and relied upon the test results before he could be examined on them.

> MR. ALFRED: ... Secondly, under Rule 703, this is an expert witness; he may testify as to items even if they are not admittable into evidence.
>
> THE COURT: Any items?
>
> MR. ALFRED: That's what it says, data or facts which are not admissible into evidence, under 703.
>
> THE COURT: Presuming that he utilize those items to arrive at his conclusion, though. I haven't heard any such foundation laid.

(*See* App. at 52 (103–04).) He also indicated that he would only allow defense counsel to inquire whether Dr. Fogarty used the FBI lab's data in forming his conclu-

sion: "But if he didn't make this report, you can't ask him about it; he doesn't know anything about conducting any lab test. He is not a lab tech. He deals with dead people." (*See* App. at 53–54 (107–08).)

■ Rule 703 allows an expert to base his opinion on otherwise inadmissible hearsay.[9] The test under Rule 703 is not whether Dr. Fogarty in fact relied upon the findings of the toxicology report, but whether they were the kind of data he would use in arriving at opinions in his expert field of pathology. Even though the judge would not let defense counsel ask any questions about the FBI report, Dr. Fogarty's testimony makes clear that these toxicology tests are the kinds of facts he relies upon in forming expert medical opinions as a pathologist. He is the investigator, after all, who sent the blood samples to the FBI lab for the purpose of having the FBI lab technicians perform tests on the blood and provide him with the results of those toxicological tests.

> BY MR. ALFRED:
>
> Q You indicated in your report, doctor, that your final diagnosis was pending toxicology.
>
> A That's correct.
>
> Q The toxicology reports, you have seen them, right?
>
> A I have.
>
> Q What do they reveal?
>
> MR. PONTEEN: Objection....
>
> ....
>
> BY MR. ALFRED:
>
> Q Dr. Fogarty, ... [w]hat is your final diagnosis in this case?
>
> A Other than what I have put on the report, I have made no change to my report. The only thing, of course, is the toxicology. I took blood samples at the

**9.** *See In Re Paoli Railroad,* 35 F.3d 717, 747–48 (3d Cir.1994) ("Rule 703 permits experts to rely upon hearsay. The guarantee of trustworthiness is that it be of the kind normally employed by experts in the field...."); see generally, *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 595, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

autopsy. Submitted them for toxicological analysis.

. . . .

Q You have not seen the [toxicological report] yet?

A I have seen it.

Q And has there been any change in your findings as a result of that?

A Not really.

. . . .

BY MR. ALFRED:

Q So there would be no changes—

MR. PONTEEN: Objection.

THE COURT: Sustained.

(App. at 52 (102–02), 54 (109–10).)

It was, thus, error for the trial judge to preclude any inquiry by the defense to Dr. Fogarty about the factual contents of the FBI toxicology report, whether or not they would be inadmissible standing alone. The broad wording of Rule 703 merely required that the FBI data be known to Dr. Fogarty at or before the hearing and need not have been admissible in evidence since it was made up of the kinds of facts reasonably relied upon by medical examiners and experts in the field of pathology. We hold that the trial judge erred in his interpretation of rule 703 when he barred Petersen from cross-examining Dr. Fogarty on the results of the toxicology report because the expert had not relied on them in making his pathology findings. We next consider whether these erroneous evidentiary rulings were harmless.

### 3. *The Evidentiary Errors Were Not Harmless*

■ Although Dr. Fogarty testified about Navarro's heroin addiction, his many needle ulcers, scarred veins, fresh needle marks, and overall malnourished cachectic, skeletonized condition of his body, (App. at 50(96), 51–52 (98–102)), the trial court did not allow the defense to cross-examine the prosecution's expert to bring out the findings of the FBI report. The trial judge deprived Petersen of the ability to bring

out as early as possible in the case, and through the government's medical examiner, that the blood the government's pathologist had drawn from Navarro contained free morphine indicating that Navarro was feeling the effects of a "hit" of heroin injected within six hours before he walked in front of Petersen's car. More importantly, the judge's erroneous evidentiary rulings prevented appellant from most effectively establishing through the government's expert that Navarro had recently gotten "a good fix" and would have been "nodding off and that sort of thing" as he walked along the road and into Petersen's path. (*See id.* at 52(102).)

The trial judge unnecessarily and erroneously forced appellant to wait until his case-in-chief to bring the evidence that Navarro was doped up from a recent "hit" of heroin through his own off-island expert, Dr. John Smialek, Chief Medical Examiner for the State of Maryland. The FBI toxicology report established that Navarro still had evidence of morphine in his blood in a very fresh state, namely, "that there was free morphine in his blood, as well as a report of total morphine." This meant that "Mr. Navarro was still under the influence of that free morphine, and he had injected it within a time of less than six hours from when he died." (*Id.* at 61 (237–38).) Dr. Smialek gave his opinion that Navarro was "impaired by the morphine in his blood stream, which was causing him some degree of visual impairment. What heroin does and what morphine does is constrict the eyes; pupils become very narrow, that affects the[ ] vision. Especially . . . in the dark." (*Id.* at 62(241).)

The government argues that the trial court's admission of the toxicology report through Dr. Smialek's testimony in the defense case-in-chief rendered harmless its ruling keeping the defense from bringing it out in the government's case-in-chief through Dr. Fogarty. We cannot agree. To be effective, appellant needed to be able to establish the full extent of the victim's physical and mental impairment as

early in the case as possible. It thus was very important that Petersen bring out through the government's medical examiner that Navarro was doped up and to the extent that he might "nod off" from the amount of heroin/morphine in his blood at the time of the accident. Getting this evidence in front of the jury later on through the off-island defense expert could not cure this damage or render it harmless. In short, we cannot find it to be highly probable that the trial judge's erroneous evidentiary rulings against Petersen did not contribute to the jury's verdict of conviction. These errors prevented Petersen from fully demonstrating through the medical examiner that the victim was mentally impaired from the free morphine in his blood, and clearly affected Petersen's substantive rights. *See Nibbs*, 31 V.I. at 223–24 n. 18, 1995 WL 78295 at *14 n. 18 (D.V.I.APP.DIV.1995); FED. R. CRIM. P. 52(a). A new trial, therefore, is required.[10]

## III. CONCLUSION

In conclusion, these errors cannot be disregarded as harmless. For the reasons stated, we find reversible error and order a new trial in this matter.

---

**10.** We accordingly do not reach Petersen's claim that the trial court erred by denying a mistrial based upon the prosecutor's statement during closing arguments regarding appellant's prior conviction for negligent driving. We similarly do not decide appellant's claim, raised for the first time on appeal, that he was prejudiced because the trial judge selected his jury right after selecting a jury for a murder trial, which he excused to return later in the week, with Petersen's trial begin-

ning the same day. We only note that appellant makes no specific allegations of prejudice, nor does he support his bald assertion of prejudice with any authority. *See generally Barry v. Bergen County Probation Dept.*, 128 F.3d 152, 158 (3d Cir.1997) (Appellant seeking to overturn discretionary decision of trial judge must demonstrate likelihood actual prejudice resulted in manifest denial of justice.).