**GOVERNMENT OF THE VIRGIN ISLANDS, Appellant**

**v.**

**RICARDO GRAHAM, Appellee**

D.C. Crim. App. No. 2001/20

District Court of the Virgin Islands

Division of St. Croix

June 24, 2005

MAUREEN PHELAN, AAG, St. Thomas, U.S.V.I., *Attorney for Appellant*.

H. HANNIBAL O'BRYAN, TPD, St. Croix, U.S.V.I., *Attorney for Appellee*.

FINCH, *Chief Judge, District Court of the Virgin Islands*; GOMEZ, *Judge of the District Court of the Virgin Islands*; and HODGE, *Judge of the Superior Court, Sitting by Designation*.

## MEMORANDUM OPINION

(June 24, 2005)

The Government appeals from an order suppressing evidence of the appellee's arrest which effectively prevented the prosecution from going forward. We are asked to review whether the trial court's suppression order was erroneous and whether one who is subjected to an illegal search and seizure may use force to avoid such an invasion.

For the reasons more fully stated below, this Court will reverse the trial court's suppression order. Given our determination that the stop and arrest of appellant were lawful, we decline to reach the latter issue.[1]

## I. STATEMENT OF FACTS & PROCEDURAL POSTURE

The government filed this appeal after the trial court suppressed evidence of the appellee's arrest for assaulting a police officer. The appellee has not filed a brief in this case; therefore, in accordance with V.I.R. APP. P. 25(c), we review this appeal solely on the appellant's submissions and the record developed in the trial court.

On December 25, 2000, Police Officer Edmund Walters ("Officer Walters") responded to a call regarding an unrelated incident in the vicinity of the Lost Dog Pub in Frederiksted. After concluding that case, Officer Walters was approached by John Burns ("Burns")[2] requesting assistance with the appellee, Ricardo Graham ("Graham"). Burns reported the appellee was sitting on his car and had become aggressive and threatening when he was asked to move. [Joint Appendix ("J.A.") at 22]. Burns told Officer Walters that Graham, while reaching into his clothing in a threatening manner, had threatened to "out" Burns, and Burns believed him to have a gun.

Officer Walters, the only officer on the scene, approached Graham while eating a bag of chips. As Officer Walters approached Graham and attempted to talk to him, Graham became loud and started to curse the officer. [J.A. at 22-23]. The officer said efforts to encourage Graham to

---

[1] Although we do not reach this issue, we question the continued vitality of the common law right to use force to avoid an unlawful search and seizure, given the protections and avenues for prompt and effective redress provided under Fourth Amendment jurisprudence.

[2] Burns is also referred to in the record as "Jack Burns." However, at the suppression hearing, he identified himself as "John Burns."

calm down were unsuccessful. Graham's friend, who was on a bicycle talking to the appellee when the officer approached, left the scene after Graham's initial outburst. [*Id.* at 23].

The officer reported that Graham also threatened to "waste" all of them and also continued to reach threateningly into his clothing. [*Id.* at 23]. As a result, the officer also developed the belief that Graham had a gun and determined to conduct a frisk. [J.A. at 23-24, 31-32]. However, when Officer Walters announced his intent to conduct a frisk, Graham punched him in the eye. [*Id.* at 23]. He noted, "At that time Mr. Graham continue cursing. I told him, 'Well, hey, I got to check you out.' I reach for him. He punch me in the eye." [J.A. at 23].

Officer Walters testified at a suppression hearing that his reason for attempting to frisk Graham was to ensure Graham was not armed, given Graham's threats of violence. [*Id.* at 24]. He said he arrested Graham only after the appellee struck him.

## II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to review this otherwise interlocutory appeal. *See* The Omnibus Justice Act of 2005, Act No. 6730, § 54 (amending Act No. 6687 (2004), which repealed 4 V.I.C. §§ 33-40, and reinstating appellate jurisdiction provisions); Revised Organic Act of 1954 § 23A, 48 U.S.C. § 1613a;[3] *see also, Virgin Islands v. Hodge*, 359 F.3d 312, 317, 45 V.I. 738 (3d Cir. 2004) (noting immediate appellate jurisdiction proper where government certifies suppression deprives it of substantial proof in the case).

The rules governing the determination of *in limine* motions require the trial court to state its essential findings on the record. *See* FED. R. CRIM. P. 12(d). Such findings supporting a suppression order are reviewed for clear error regarding the facts, and we exercise plenary review over legal issues. *See Government of the V.I. v. Petersen*, 131 F. Supp. 2d 707, 710 (D.V.I. App. Div. 2001). However, where, as here, the trial court fails to make factual findings in ruling on a motion to suppress in accordance with Rule 12(d), our review of its legal conclusions is plenary, and we may uphold the ruling of the trial court if there is any

---

[3]    The complete Revised Organic Act of 1954 is found at 48 U.S.C. §§ 1541-1645 (1995 & Supp. 2003), *reprinted in* V.I. CODE ANN. 73-177, Historical Documents, Organic Acts, and U.S. Constitution (1995 & Supp. 2003) (preceding V.I. CODE ANN. tit. 1).

reasonable view of the evidence to support it. *See Scarbeck v. United States*, 115 U.S. App. D.C. 135, 317 F.2d 546, 562 (D.C. Cir. 1963); *cf. United States v. Belle*, 593 F.2d 487, 497 (3d Cir. 1979) (noting that while appellate court would ordinarily remand for initial probable cause determination, it could decide the issue where the record is sufficient for that determination to be made).

## III. DISCUSSION

Defense counsel argued below that: 1) Officer Walters had no reasonable suspicion to stop and question Graham, or to conduct a pat-down, because at the time of those events the appellee was accused of only sitting on the complainant's car and no crime had been committed; 2) the warrantless arrest was improper, and; 3) that Graham had a right to use force to resist an illegal arrest.

The government presented contrary arguments that: 1) the officer held a reasonable suspicion that the appellee was armed and dangerous, given the facts surrounding his initial encounter with the appellee and, therefore, properly attempted a pat-down; 2) no seizure occurred where the appellee did not comply with the officer's request to conduct a pat-down, and; 3) alternatively, even if there was an invalid stop, the appellee had no right to forcefully resist an unlawful arrest or seizure. All of these claims rest on a Fourth Amendment analysis.

 The Fourth Amendment protects individuals from unreasonable intrusions "in their persons, houses, papers, and effects," *see* U.S. CONST. amend. IV;[4] *Katz v. United States*, 389 U.S. 347, 357, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967), and, therefore, imposes procedural safeguards governing police-citizen encounters. These safeguards do not foreclose all police-initiated encounters or questioning. *See Florida v. Bostick*, 501 U.S. 429, 434, 115 L. Ed. 2d 389, 111 S. Ct. 2382 (1991) (noting that "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free "to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required.") (citation omitted); *Florida v. Royer*, 460 U.S. 491, 497-501,

---

[4]     U.S. CONST. amend. IV is made applicable in the Virgin Islands by § 3 of the Revised Organic Act of 1954, 48 U.S.C. § 1561 (1995). The Revised Organic Act of 1954 is found at 48 U.S.C. §§ 1541-1645 (1995 & 2003), *reprinted in* V.I. CODE ANN., Historical Documents, 73-177 (codified as amended) (1995 & 2003).

75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983) ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions."); *Terry v. Ohio*, 392 U.S. 1, 19-20, n.16, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968) (noting that "not all personal intercourse between policemen and citizens involves 'seizures' of persons"). Rather, whether a seizure occurs for Fourth Amendment purposes is based on the totality of the circumstances suggesting the use of physical force or a show of authority by police which would make a reasonable person feel he was not free to leave. *See Penn v. Virgin Islands*, 41 F. Supp. 2d 572, 574, 40 V.I. 190 (D.V.I. App. Div. 1999); *Terry*, 392 U.S. at 20 n.16.

In recognition of the need for police officers to briefly maintain the status quo or conduct limited questioning under some circumstances, the law as developed under the Fourth Amendment permits officers to make brief investigatory stops on information short of probable cause. Such stops are constitutional where based on reasonable suspicion, supported by articulable facts, that criminal activity is afoot. *See Illinois v. Wardlow*, 528 U.S. 119, 123, 145 L. Ed. 2d 570, 120 S. Ct. 673 (2000) (citing *Terry*, 392 U.S. at 27-30). Activity need not be illegal on its face; indeed, exclusively legal activity, viewed under the totality of the circumstances, may also give rise to an inference that a crime has been or is about to occur and may form a proper basis for a *Terry* stop. *See id.* at 124-25; *see also, United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000). Where an officer has a proper basis for stopping and questioning an individual under *Terry*, a frisk of the suspect's outer clothing, to check for weapons to ensure the officer's safety, is also permissible. *See Terry*, 392 U.S. at 26-28.

## A. The Initial Encounter

The facts surrounding Officer Walters' initial encounter with Graham do not support a finding that a seizure occurred within the Fourth Amendment.

Officer Walters initially approached Graham at the request of another citizen. It was undisputed that Officer Walters was the only police officer present when he approached Graham, and did so while

eating a bag chips. There was no evidence presented at the suppression hearing pointing to a show of authority by the officer, either in his demeanor or his words, that would have led a reasonable person to believe he was not free to leave or could not have opted to disregard the officer's questions. Indeed, there was testimony that another individual who was present with Graham at the time left the area, undeterred, as the officer approached. Under these facts, Officer Walter's act of approaching Graham to talk, in an apparent attempt to diffuse a conflict between two citizens, cannot support a finding that there was a seizure for Fourth Amendment purposes.

## B. Did Encounter Develop Into Seizure?

Even if the initial encounter ripened into a stop when Officer Walters announced and then attempted to conduct a pat-down, despite the fact that Graham did not submit to the frisk,[5] this Court has little difficulty under the facts of this case in finding such a stop properly supported by reasonable suspicion. *See Penn,* 41 F. Supp. 2d at 574 (noting that, "Even if a stop is justified at its inception, it must remain reasonably related in scope to the circumstances which justified the intrusion in the first place to stay within the confines of the Constitution.") (citing *Florida v. Royer,* 460 U.S. 491, 500, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983); *Terry,* 392 U.S. at 19-20, 30)).

When Officer Walters initially approached Graham, he was armed with information from the victim/witness that Graham had been acting "agitated and that he kept reaching his hand under his shirt like he was pulling a weapon or something out." [J.A. at 35]. Burns additionally testified that during that confrontation Graham threatened, "I will just Flying out you." [J.A. at 34]. Officer Walters further testified, consistent with Burns' testimony regarding the incident, that the initial information he received from Burns upon arrival at the scene was that "the guy got verbally abusive and kept reaching in his waist and that he believe he had

---

[5] *See California v. Hodari D.,* 499 U.S. 621, 626-28, 113 L. Ed. 2d 690, 111 S. Ct. 1547 (1991) (noting that seizure occurs only where the person submits to a show of police authority); *see also, Olinsky v. Virgin Islands,* 2004 U.S. Dist. LEXIS 5627 (D.V.I. App. Div. 2004) (noting that no seizure occurred where appellant did not comply with police order to stop and raise his hands; therefore, gun thrown in truck prior to seizure was admissible), *aff'd,* 119 Fed.Appx. 405, 407 (3d Cir. 2005).

a gun." [J.A. at 22]. Officer Walters, upon encountering Graham, then had a similar experience as that reported by Burns:

> When I first approached him he started cursing, carrying on, talking about I had no business approaching him because I listening to some white man with a gun and he's going to waste all of us, and he's going to kill us, and you know, all that type of stuff.
>
> I tried to tell Mr. Graham that ain't had no place here for that attitude. He need to go some place else with it. And his friend, who he was talking to, got real upset, started cursing him out, telling him that he needed to discontinue his behavior. And he indicated that he didn't want to be a part of it. He got on his bike and he rode south, and then made a left.

[J.A. at 23]. Only after those threats were made directly to him, and after personally witnessing the suspect's demeanor and aggression, did Officer Walters announce his intent to conduct a pat-down. [*Id.*]. These repeated threats of violence, coupled with Graham's aggressive behavior and threatening gestures, as well as the similar threats made earlier against Burns, sufficiently warranted the officer's reasonable belief that Graham possessed a firearm and presented a danger to the officer and others.

Although it did not specifically enter findings or conclusions of law on the motion, the court's comments made at the conclusion of arguments at the suppression hearing suggest the court found reasonable suspicion lacking where the officer may have had only a reasonable belief that Graham possessed a weapon, without any articulable facts that his possession of such weapon may have also been unlawful. The court noted:

> The court will make the observation for the record that because a report has been made that an individual is armed with a gun, or a knife or any other dangerous weapon—well, let's say a gun in particular. It does not mean that the police officers have the right to go and pat down or search.
>
> There must be some other basis in which you can approach the individual ... . You got to realize that to find a violation of law you must have more than just the mere fact that an individual have a

weapon. You must have a reasonable belief that possession of the weapon is also unlawful.

That is, by a check of registration at Public Safety, or otherwise, because people are permitted by law to carry weapons. And the mere fact that you have a weapon, doesn't give you an indication that the law is being violated. An off duty police officer have a right to carry a weapon. It's usually licensed. A serviceman in the service of the United States have [sic] a right to carry a weapon. Persons licensed have the right to carry a weapon. There is a list of individuals who have the right to carry a weapon.

So, that mere fact that an individual is alleged to have a weapon does not indicate that a crime is being committed, without more. Unless you know, for example, that the person who is alleged to have the weapon is a felon, and therefore could not obtain a license, or if you have factual knowledge that this particular individual has no license to possess. But mere possession alone is not sufficient.

[J.A. at 45-46]. The court's statements misconstrue the current law and presents an unseeming conundrum for law enforcement by erecting an almost insurmountable hurdle that, in most cases, is more appropriate for a probable cause analysis.

Indeed, uncovering the facts to determine that a suspect is lawfully in possession of a firearm would necessarily require further inquiry of the suspect to determine, at minimum, a name and other information which bears on whether he has the requisite authority to carry arms. Such facts are not generally observable or ascertainable through a record check without first obtaining limited statistical information. Thus, imposing a standard such as that suggested by the trial court would serve to completely bar law officers from taking deterrent actions in virtually all firearm cases on anything short of probable cause to arrest.

Any suggestion that officers have no right to frisk for weapons on anything short of reasonable suspicion that the suspect meets one of the many requirements for lawful possession also appears contrary to local law.

Virgin Islands law authorizes law enforcement officers to approach and conduct a limited search of any person who, "in the light of his observations, information and experience," he reasonably believes may

be carrying an unlicensed firearm and is or may be thus dangerous to the officer or to others. 23 V.I.C. § 488. The full authority provided by that statute is as follows:

(a) Any law enforcement officer who, in the light of his observations, information and experience, has a reasonable belief that (i) a person may be wearing, carrying, or transporting a firearm in violation of section 454 of this title, (ii) by virtue of his possession of a firearm, such person is or may be presently dangerous to the officer or to others, (iii) it is impracticable, under the circumstances, to obtain a search warrant; and (iv) it is necessary for the officer's protection or the protection of others to take swift measures to discover whether such person is, in fact, wearing, carrying, or transporting a firearm, such officer may:

(1) approach the person and identify himself as a law enforcement officer;

(2) request the person's name and address, and, if the person is in a vehicle, his license to operate the vehicle, and the vehicle's registration; and

(3) ask such questions and request such explanations as may be reasonably calculated to determine whether the person is, in fact, unlawfully wearing, carrying, or transporting a firearm in violation of section 454 of this title; and

(4) if the person does not give an explanation which dispels the reasonable belief which he had, he may conduct a search of the person, limited to a patting or frisking of the person's clothing in search of a firearm. The police officer in acting under this section shall do so with due regard to all circumstances of the occasion, including but not limited to the age, appearance, physical condition, manner and sex of the person approached.

(b) In the event that the officer discovers the person to be wearing, carrying, or transporting a firearm, he may demand that the person produce evidence that he is entitled to so wear, carry, or transport the firearm pursuant to section 454 of this title. If the person is unable to produce such evidence, the officer may then seize the firearm and arrest the person.

494

■■■■■■■■■■■■

(c) Nothing in this section shall be construed to limit the right of any police officer to make any other type of search, seizure, and arrest which may be permitted by law.

*Id.* (emphasis added). Subsection (b) of that statute makes clear that the determination whether possession is lawful bears on the appropriateness of an arrest or the probable cause determination, and not on whether an officer has reasonable suspicion to stop and frisk.

While our court of appeals appeared to apply a heightened standard by requiring reasonable suspicion of the legality of the possession to support a stop in *United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000), the facts before the *Ubiles* Court are distinguishable.

In *Ubiles,* the court of appeals held that the stop of a J'ouvert reveler, based solely on an anonymous tipster, was unsupported by reasonable suspicion in part because the officer's information regarding the defendant's likely possession of the gun gave him no reasonable basis for believing the defendant also was not authorized by law to have such firearm. *See Ubiles*, 224 F.3d at 217-18. The court reasoned that, because the criminality in the local firearm statute is based on *unauthorized* possession of a firearm and not mere possession, an officer's reasonable suspicion must be based on articulable facts that the suspect is not licensed or is not among the classes of individuals who are otherwise authorized by law to possess a firearm. *See id.*

■ Significantly, the *Ubiles* Court was not faced with facts supporting a belief that the suspect posed a safety risk to police officers or others; indeed, the Court found the contrary, given the fact that the suspect was merely enjoying the J'ouvert just as other revelers. There, unlike the case at bar, law officers acted on a mere tip from an anonymous informant, who gratuitously offered the information and then left the area. That was the sole factor on which the officers' stop and frisk was based. *See id.* In the case *sub judice* we are faced, not with an anonymous tipster regarding mere possession, but with an initial report from one more appropriately regarded as a victim or witness with first-hand information of the suspect's actions and threats. Moreover, the police officer experienced first-hand the suspect's death threats and threatening gestures. Finally, the suspect in this case was not simply going about his business with what the officer believed to be a concealed weapon, but made pointed death threats at both the victim/witness and the police

officer, thus giving rise to a reasonable belief that the safety of the officer and others was in danger.

In subsequent decisions since *Ubiles,* the court of appeals has clarified what at first appeared to be a broad holding, and reaffirmed that reasonable suspicion determinations are to be based on the full circumstances and context of the case.

In *United States v. Thomas,* 74 Fed. Appx. 189, 191-192 (3d Cir. 2003), that Court rejected the appellant's argument that his arrest for possession of an unlicensed firearm was inconsistent with the holding in *United States v. Ubiles* where officers lacked reasonable suspicion at the time of the stop that the appellant had no license to carry a firearm. *Id.* The court reasoned that the case was distinguishable from *Ubiles* because police had more facts to suggest that criminal activity was afoot, besides a mere tip that the defendant possessed a gun. *Id.* (noting that officers had tip from a co-conspirator and had also observed other indicia of criminal behavior). Under those facts, the Court determined that whether there was reasonable suspicion that the appellant had a license to carry the firearm was not dispositive. The Court further noted that the appellant's arrest was properly based on probable cause where the appellant could not, following the search and discovery of a firearm, prove that he had a license therefor. *See id.*

In *United States v. Valentine,* 232 F.3d 350, 355-57 (3d Cir. 2000), decided several months after *Ubiles,* the Court was again confronted with a challenge based on its reasoning in *Ubiles.* Noting that the reliability of a tip is but one factor to be considered in evaluating whether there was reasonable suspicion for a stop based on a tip that a suspect is carrying a firearm, the *Valentine* Court stated: "If we focus on the content of the tip, (the appellant) can invoke our recent holding that, <u>in some contexts,</u> even if police officers have a reliable tip saying that someone is carrying a gun, that information alone will not provide enough evidence to support a *Terry* stop." *Id.* (citing *Ubiles,* 224 F.3d 213) (emphasis added). The Court noted, however, that other facts pointing to illegal activity presented a "broader context" for consideration of the firearm issue, which distinguished that case from the flimsy basis present in *Ubiles. Id.* (noting appellant was walking around 1:00 a.m. in a high-crime area known for shootings).

The *Valentine* Court, reiterating its acknowledgment in *Ubiles* "that reasonable suspicion does not require that the suspect's acts must always be themselves criminal" before a lawful stop can be effected,' noted:

> Indeed, given the large number of potential crimes and the danger posed by an armed criminal, we think that if the police officers had done nothing and continued on their way after receiving the informant's tip, the officers would have been remiss. People who live in communities torn by gunfire and violence are entitled to be free from fear of victimization and have police investigate before shootings occur. As the Supreme Court said in *Wardlow,* when the police learn of potentially suspicious conduct, officers can stop and question the suspects to resolve ambiguity about the suspects' conduct.

*Id.* (citing *Wardlow*, 528 U.S. at 125-26).

■ These pronouncements by the Court make clear that *Ubiles* was not intended to establish a bright-line rule that in all cases an officer offends the Fourth Amendment if he stops an individual on anything short of reasonable suspicion that he is both in possession of a gun and that such possession is unlawful. Accordingly, to the extent the trial court determined that *Ubiles* requires such a showing in all circumstances, it committed error.

## C. The Arrest

■ A seizure amounting to arrest must be based on probable cause. *See Wong Sun v. United States*. 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963). That standard is satisfied where the information available to the officer at the time is such that would warrant a reasonable belief that an offense has been committed. *See id.*; *see also, Beck v. Ohio*, 379 U.S. 89, 96, 13 L. Ed. 2d 142, 85 S. Ct. 223 (1964).

The evidence presented at the suppression hearing, and consistent with the offenses charged, was that Graham was arrested, not for sitting on a car as he asserted, but for assaulting the officer. The evidence was that, as Officer Walters reached toward Graham in an attempt to conduct a frisk, Graham struck him in the eye:

A    I told him that I had to pat him down.

Q    Why did you have to pat him down?

A   Because I was told that he had a gun.

Q   So the reason for patting him down was what?

A   For I wanted to pat him down to see if he had a weapon.

Q   I see. And the reason for the pat down was because he had a gun?

A   He was making threats. It's possible that he was armed ... .

Q   Then what happened?

A   He punch me in the eye. When he punch me in the eye, I like took a step back and then he tried to lunge again. And when he lunged, I hit him with the stick and—

Q   You hit him with—

A   Oh! I hit him with the baton. After that he stood back. I stood back. I was—my first thought was to call for assistance, and then I realized that I had left the station without a radio. Then I was thinking to go get a phone, but I didn't want to leave and break contact with Mr. Graham. Then Mr. Graham was like, "Oh man! You know you bust my head."

I was like, "Hey, you know you punch me ... ."

[J.A. at 24-25]. Burns also testified that he witnessed Graham swing at the officer, although he did not know whether Officer Walters was actually struck.[6] [J.A. at 35]. Moreover, the officer testified he arrested Graham for striking him in the eye, and Graham was charged with assault.

█ Having been the victim of the assault in this case, Officer Walters had first-hand information regarding the crime and probable cause that a crime had, in fact, been committed. Accordingly, the arrest was proper.

---

[6]   Graham argued at the suppression hearing that Burns' inability to testify that he actually saw Graham's hand connect with the officer indicated the government could not prove he struck Officer Walters. [J.A. at 44]. However, Officer Walters testified he was struck. That evidence on the record, if refuted by the appellee, would then present a credibility issue for the factfinder, but is not a proper basis for suppressing evidence of the arrest.

## IV. CONCLUSION

In view of the foregoing, the trial court's order suppressing the appellee's arrest in this matter will be reversed and the matter remanded for further consideration consistent herewith.