**JAMES LAUDAT, Appellant**

**v.**

**GOVERNMENT OF THE V.I., Appellee**

D.C. Crim. App. No. 2004/023

District Court of the Virgin Islands

Division of St. Croix

April 3, 2007

DEBRA S. WATLINGTON, TPD, St. Thomas, U.S.V.I., *For Appellant.*

MAUREEN PHELAN, AAG, St. Thomas, U.S.V.I., *For Appellee.*

FINCH, *Chief Judge, District Court of the Virgin Islands*; GOMEZ, *Judge of the District Court of the Virgin Islands*; and HODGE, *Judge of the Superior Court of the Virgin Islands, Sitting by Designation.*

### MEMORANDUM OPINION

(April 3, 2007)

Having been convicted in the Superior Court of four counts of assault first degree, two counts of assault third degree and two counts of possession of a dangerous weapon, James Laudat ("Laudat" or

"appellant") now asks us to review whether the trial court, in its failure to admit three psychiatric reports, wrongfully excluded from trial evidence of his mental illness.[1] For the reasons stated herein, we will affirm.

## I. STATEMENT OF FACTS AND PROCEDURAL POSTURE

In the evening of November 21, 2001, Laudat warned his mother, Paulette Walters ("Walters"), his sister Verna Laudat ("Verna") and her friend Augustine Angol ("Angol") as they were leaving for the evening that "judgment is coming" and that they would all die. [Joint Appendix ("J.A.") at 132, 198]. According to his family, that threat was part of Laudat's history of making threats to kill his family. [J.A. at 132-33]. At the time of Laudat's final threat, there was animus between him and his family, because his mother had, on that same day, forced his girlfriend from the home. [J.A. at 113-15, 187, 199-200].

In the early morning hours of November 22, 2001, shortly after his family returned home and went to bed, Laudat attacked Walters, Verna and Angol, as well as his mother's male friend, Earl Moore ("Moore"), as they slept in the Estate Paradise home they all shared. [J.A. at 116-18].

Walters was awakened to Laudat striking her with a hammer to the face and head. [J.A. at 119-20]. He then stabbed her repeatedly to the chest, head and back. [J.A. at 120]. As Walters fled the room, Laudat turned his attack to Moore, who was sleeping alongside Walters, striking him with the hammer repeatedly in the face, mouth and head. [J.A. at 84-86, 120-21].

Laudat then kicked in the door to the room Verna and Angol shared and repeatedly stabbed Angol in the chest and back, and Verna in the hand, shoulder and head. [J.A. at 190-91]. The knife attack ended only after the knife broke in Angol's back. [J.A. at 153]. Laudat then fled the home, but grabbed Walters, who had gone outside. He released her after she pled with him and reminded him that she was his mother. [J.A. at 193]. After first cutting the telephone lines on the exterior of the house, [J.A. at 194-95], Laudat left the area on foot.

---

[1] Although the government offers much argument on the correctness of the jury instruction for the insanity defense, that issue is not challenged on appeal. The issue surrounding the sufficiency of the information provided the jury is raised only in the context of the appellant's argument that a note from the jury seeking further explanation of the insanity defense evidenced the need for the jury to have the excluded psychiatric reports. [Br. of Appellant at 24].

The victims described Laudat as "wide eyed" during the attacks and said he remained silent throughout, except for making a "Hmmph, Hmmph" sound. [J.A. at 153, 191-92]. Laudat later claimed he had no recollection of the attacks.

Laudat was charged in Superior Court with four counts of assault first degree/domestic violence, two counts of assault third degree/domestic violence, and two counts of possession of a dangerous weapon during a crime of violence. [J.A. at 47-49].

Prior to trial, the trial court ordered competency examinations. Those examinations were conducted by Dr. Norma Carillo ("Dr. Carillo"), who generated three reports based on those examinations. [J.A. at 17-18, 35-36, 41-42, 273-80]. In the second report filed after examining Laudat, Dr. Carillo found Laudat competent to stand trial; however, none of the three reports passed on the issue whether he was operating under mental disease or defect when he committed the crimes.

At trial, Laudat raised the insanity defense. [J.A. at 37]. It was established at trial, through the testimony of Dr. Carillo, the appellant, and Walters that the appellant had a history of mental illness and had been previously diagnosed as schizophrenic. [J.A. at 139-38, 274-79, 311-21]. Dr. Carillo further noted that Laudat's schizoprenic behaviors could be controlled if a medication regimen is followed. She added that Laudat indicated he was not adhering to the prescribed regimen at the time of the attacks. Although Dr. Carillo testified at trial regarding the full substance of her reports, the trial court denied admission of the three reports she authored, on grounds they did not advise whether Laudat had committed the acts while suffering under mental disease or defect.

Laudat was convicted of all counts charged in the information, [J.A. at 50-52], and this appeal followed.

## II. DISCUSSION

### A. Jurisdiction and Standards of Review

This Court has jurisdiction to review the final judgment in this criminal matter. *See* The Omnibus Justice Act of 2005, Act No. 6730, § 54 (amending Act No. 6687 (2004), which repealed 4 V.I.C. §§ 33-40,

and reinstating appellate jurisdiction in this Court); Revised Organic Act of 1954 § 23A, 48 U.S.C. § 1613a.[2]

We generally review findings of fact for clear error and afford plenary review to the trial court's determinations of law and claims implicating rights under the constitution. *See Poleon v. Gov't of V.I.*, 184 F. Supp. 2d 428 (D.V.I. App. Div. 2002); *Bryan v. Gov't of V.I.*, 150 F. Supp. 2d 821, 827 n.7 (D.V.I. App. Div. 2001). The trial court's exclusion of evidence is reviewed, for abuse of discretion; however, to the extent its ruling is based on an interpretation of the rules, our review is plenary. *See Gov't of the V.I. v. Petersen*, 131 F. Supp. 2d 707, 710 (D.V.I. App. Div. 2001); *Gov't of V.I. v. Albert*, 241 F.3d 344, 347 (3d Cir. 2001).

## B. Whether Trial Court's Exclusion of Psychiatric Reports Deprived the Jury of Evidence of the Appellant's Mental Illness.

Laudat contends the trial court committed reversible error in denying admission of Dr. Carillo's reports, offered as exhibits 7, 8 and 9. He claims such failure impinged on his ability to fully present his insanity defense and deprived the jury of evidence relevant to negating the *mens rea* of the crimes. The government, however, argues the exclusion of the reports was not erroneous and, alternatively, was at worst harmless error where the information in the reports was put to the jury through Dr. Carillo's testimony.

 The standard for an insanity defense is as stated in V.I. CODE ANN. tit. 14, § 14(4).[3] That section excludes from criminal culpability "persons who are mentally ill and who committed the act charged against them in consequence of such mental illness." 14 V.I.C. § 14(4); *see also Gov't of V.I. v. Webbe*, 821 F.2d 187 (3d Cir. 1987). Once insanity is properly put in issue, the burden to disprove that defense beyond a reasonable doubt rests with the government. *See Gov't of V.I. v. Bellott*, 495 F.2d 1393, 1397, 11 V.I. 181 (3d Cir. 1974); *compare, Walker v. Gov't of V.I.*, 277 F. Supp. 2d 605, 609 (D.V.I. App. Div. 2003) (noting that prosecution bears burden to disprove affirmative defenses once the accused comes

---

[2] The complete Revised Organic Act of 1954 is found at 48 U.S.C. §§ 1541-1645 (1995 & Supp. 2003), *reprinted in* V.I. CODE ANN. 73-177, Historical Documents, Organic Acts, and U.S. Constitution (1995 & Supp. 2003) (preceding V.I. CODE ANN. tit. 1).

[3] The appellant incorrectly relies on the insanity standard provided under federal law, rather than section 14(4).

forward with evidence on the issue) (citing *Gov't of V.I. v. Smith*, 949 F.2d 677, 680, 27 V.I. 332 (3d Cir. 1991)).

In this instance, Dr. Carillo, the author of the subject reports, was called for the defense and testified on direct examination that she had met with Laudat in connection with this criminal matter on at least three occasions, in January 2002, January 2003, and August 2002. [J.A. at 274-75]. She also testified that Laudat had previously been treated at the mental health clinic, even prior to the attacks. [J.A. at 275, 303-06]. After explaining that a psychiatric evaluation entails asking questions of the patient to determine his mental status, [J.A. at 276], Dr. Carillo then specifically outlined the course of her January 29, 2002 examination of Laudat as follows:

> I asked him mental status examination like: What date is it today? No answer. What is your name? No answer. There was no verbal communication on that date of January 29, 2002.
> I have right up here, client appear [sic] to be experiencing hallucination. I have also here in my note the last evaluation to the psychiatric unit at Juan Luis unit was April 6th, 2001 and he was diagnosed as schizophrenia.

[J.A. at 276-77]. Defense counsel noted on the record that the doctor was reading from a document which he had marked as Defendant's Exhibit No. 7. [J.A. at 277]. It was also noted on direct and cross examination that the report indicated Laudat had been previously diagnosed in 2001 as schizophrenic. [J.A. at 277]. In fact, the doctor's testimony mirrored significantly what was contained in that report. [J.A. at 17-18].

With regard to Exhibit 8, Dr. Carillo also testified that on January 21, 2003, she again saw Laudat in the mental health clinic and conducted an evaluation "to determine whether he is competent to stand trial and to determine whether the medication is beneficial." [J.A. at 278]. Her testimony included the general statistical and background information listed on that report, including the fact that Laudat has had a problem "since age 24. Age 24 he become [sic] explosive, paranoid, problem with his sleep, also has hypertension" and also that Laudat had a history of being treated at the mental health clinic. [J.A. at 35-36, 278-79]. Dr, Carillo further testified to the medication that was prescribed after that evaluation. [J.A. at 278-79]. Again, the testimony substantially mirrored the information contained in Exhibit 8.

Similarly, Dr. Carillo testified that she generated another report on October 7, 2003, marked as Exhibit 9, after conducting an evaluation at the court's request. Appearing to read the background and description directly from the exhibit, Dr. Carillo outlined the prescribed medications and added that Laudat had reported that the medication given him was helpful in preventing episodes of paranoia and hallucinations. [J.A. at 281-82]. She also reported his diagnosis as chronic schizophrenia, personality disorder, although she testified that during that evaluation Laudat denied auditory or visual hallucinations or homicidal or suicidal ideas. [Id.]. Dr. Carillo also testified that Laudat had a mental condition dating back to June of 1996, as recorded in Exhibit 9. [J.A. at 281-91]. She explained to the jury that "schizophrenia" was a mental illness that can be dangerous without medication and explained that the effect of failing to adhere to the medication regime is to "make a person dangerous to themselves and others when they are acutely psychotic." [J.A. at 282, 283-85; see also, 348-49 (similar testimony by Dr. Chester Copeman)]. Finally, Dr. Carillo testified that, from a review of his chart, it appeared Laudat did not follow medication protocol regularly which, she said, can cause him to have a relapse of symptoms. [J.A. at 284-85]. Although Dr. Carillo appeared to waver on questions calling for an opinion directly attributing Laudat's conduct to his mental illness, [see J.A. at 287 (opining link between acts and mental illness), 301 (retreating from opinion)], she explained that Laudat's conduct would depend on whether he was actively hallucinating at the time; she noted, however, that Laudat asserted during his evaluation that he was "not in control because is [was] not taking his medication" at the time of offenses. [J.A. at 285-87].

Dr. Chester Copeman ("Dr. Copeman"), a clinical psychologist, also testified for the defense regarding Laudat's mental defect which, without medication, would result in periods of unawareness and confusion, although he declined to offer an opinion regarding whether Laudat's actions on the day in question resulted from such mental defect. [J.A. at 348-49, 353-54].

Laudat also testified to his mental health history and to his failure to take medication and the resulting regression he suffered just prior to the attacks. [J.A. at 313-24]. He also testified to his inability to recall the attacks on his family, [J.A. at 324-27]. Similar testimony regarding Laudat's known mental illness was also offered by his mother, one of the

victims in this case. [J.A. at 138-39]. The jury was, therefore, presented with evidence of Laudat's mental illness.

■ Moreover, given the testimony at trial, the jury had before it all of the information contained in the reports regarding Laudat's mental illness and mental health history. Dr. Carillo's written reports were, therefore, merely cumulative evidence and their exclusion, if error, provides no basis for reversal. *See* FED. R. CRIM. P. 52(a) (instructing that errors not affecting substantial rights should be disregarded); V.I. CODE ANN. tit. 5, § 775 (only errors in exclusion of evidence which "probably have had a substantial influence in bringing about a different verdict or finding" warrant reversal); *see also, United States v. Mitchell*, 365 F.3d 215, 253 (3d Cir. 2004) (noting that "the availability of cumulative or substitute evidence" can make evidentiary error harmless and holding that error in admission of evidence was harmless where the government also introduced substitute evidence on same point) (citing *United States v. Arroyo*, 805 F.2d 589 (5th Cir. 1986)); *cf. United States v. Anderskow*, 88 F.3d 245, 251 (3d Cir. 1996) (improper admission of cumulative evidence is generally harmless error).

## III. CONCLUSION

Even assuming the information contained in Dr. Carillo's reports was admissible relevant evidence bearing on Laudat's likely mental state at the time of the offenses, their exclusion did not constitute reversible error where the full substance of the reports was admitted through other means at trial. We will, accordingly, affirm.