**F I L E D**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

PAUL DEAN HODGES,

      Defendant-Appellant.

No. 06-5038
(D.C. No. 05-CR-124-HDC)
(N.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **O'BRIEN, HOLLOWAY,** and **HOLMES**, Circuit Judges.

Defendant-Appellant Paul Hodges was indicted on August 2, 2005, for one

count of possession of a firearm and ammunition by a prohibited person, a

violation of 18 U.S.C. §§ 922(g)(8) and 924(a)(2). Hodges filed a motion to

suppress the use as evidence of the firearm and ammunition on the grounds that

the officers obtained the evidence in an unlawful search and seizure. The district

court denied Hodges' motion to suppress and conducted a jury trial. Hodges was

found guilty, and he received a sentence of 24 months' incarceration, three-years'

---

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 (eff. Dec.
1, 2006) and 10th Cir. R. 32.1 (eff. Jan. 1, 2007).

supervised release, a $2,000 fine, and a special assessment of $100.  Hodges now appeals.  The only issue presented to us is the correctness of the district court's denial of Hodges' motion to suppress.

We have jurisdiction under 28 U.S.C. § 1291 and affirm Hodges' conviction.

## I. BACKGROUND

On January 24, 2005, at approximately 4:30 a.m., Tulsa police officer Charles Haywood responded to a suspicious-person report.  R., Vol. III, at 4 (all references to "R." are to Volume III of the record).  When he arrived in the area—an area he and his colleague, Officer Jason White, described as a high-crime area—he saw a person who matched the description given in the report.  R. at 5, 6, 34.  Officer Haywood stopped the person, who identified himself as Chester Alexander, and began asking him questions.  R. at 6.

Officer Haywood testified that Mr. Alexander denied engaging in suspicious activity, but reported that the occupants of a silver vehicle had just threatened him.  R. at 15, 6.  Specifically, Mr. Alexander said that he was leaving a nearby motel parking lot when he saw a silver vehicle.  R. at 6.  Hoping to receive a ride, Mr. Alexander approached the driver of the vehicle, who turned out to be Hodges.  R. at 7.  But Hodges rebuffed Mr. Alexander, telling him something to the effect of "[g]et your ass away from this car right now or there's going to be trouble."  R. at 7, 20.

The parties disagree about whether Hodges threatened Mr. Alexander with a gun. The district court found that Hodges' gun was in plain view when he threatened Mr. Alexander. Moreover, while Officer Haywood testified that, according to Mr. Alexander, Hodges never brandished or pointed his gun at Mr. Alexander, R. at 19, Officer Haywood testified that he believed that the essence of Mr. Alexander's tip, given "[h]is body language and the way he was presenting this information," was that "the guys in the car were going to do something with this firearm. That's why they were telling him he had better get away from this car, something was fixing to go down is the way I perceived it." R. at 27. In other words, Officer Haywood testified, he interpreted Mr. Alexander as saying that the man in the silver vehicle threatened him with the gun. R. at 19 (testifying that Mr. Alexander was threatened "by the subject that had the gun," which he took in this context "as one and the same" as being threatened "by the gun").

When asked why he thought the gun was loaded, Officer Haywood testified that "I was looking at the time of day, it was after 4:00 a.m., the location, the high-crime area, specifically a motel parking lot where a lot of crimes occur, I was thinking that there was possibly going to be a robbery or a shooting may happen." R. at 10.

Officers White and Ohrynowicz arrived at the scene toward the end of Officer Haywood's conversation with Mr. Alexander, which ended with Mr. Alexander pointing out the silver vehicle to the officers. R. at 8, 39. Officer

-3-

Haywood testified that he "advised Officer White what Mr. Alexander had related to [him] and . . . direct[ed] Officer White to check out the car." R. at 8. Meanwhile, Officer Haywood conducted an identification check on Mr. Alexander, which revealed that Mr. Alexander had a felony warrant for his arrest. R. at 10-11. Officer Haywood therefore took Mr. Alexander into custody. R. at 11.

At Officer Haywood's request, Officers White and Ohrynowicz drove in their separate police cars toward the silver vehicle that Mr. Alexander identified. R. at 8, 40. Officer White testified that the vehicle accelerated "at a more of [sic] a rapid rate than the normal just pulling out onto the street. And it appeared that [the driver of the silver vehicle] was trying to get through the intersection before the light changed and he wasn't able to." R. at 40. Officer White activated his emergency lights after passing through the intersection behind the vehicle Hodges' was driving, but Hodges failed to stop the vehicle for what Officer White described as an unusually long time (almost two blocks). R. at 42-43, 46.

Officer White testified that based on the information Officer Haywood relayed to him, his understanding of what transpired between Mr. Alexander and Hodges, and the "very heightened awareness" he developed from observing Hodges, he and Officer Ohrynowicz conducted a so-called "high-risk traffic stop." R. at 57-58, 44. Officer White described a "high-risk traffic stop" as one where two or three police vehicles pull side-by-side to illuminate a car with

lights, the objective of which is to erect a "light curtain" so the individual in the car is unable to see the police officers behind the lights. R. at 44.

Officers White and Ohrynowicz conducted such a stop and then ordered Hodges to exit his vehicle and walk backward toward the officers. R. at 45. Officer White then handcuffed Hodges and, after Hodges was secured, Officer White conducted a pat-down search. R. at 47. Officer White asked Hodges to sit down while Officer Ohrynowicz approached the vehicle. R. at 48. Officer White testified that he set Hodges down because he did not know whether there was another individual in the car, and setting Hodges down made it difficult for Hodges to escape and easier for Officer White to simultaneously watch Hodges and Officer Ohrynowicz. R. at 48. As Officer Ohrynowicz approached the vehicle, he informed Officer White that he could see in plain view the end of a gun protruding from under the driver's seat. R. at 48.

The officers secured the weapon and conducted a criminal history check on Hodges. R. at 48. The criminal history check revealed that Hodges was currently subject to a valid protective order, which made it unlawful for Hodges to possess a gun, so the officers arrested him. R. at 49.

## II. DISCUSSION

We make a two-part inquiry when addressing whether an investigative stop was constitutional. First, the officer's action must be justified at its inception. Terry v. Ohio, 392 U.S. 1, 20 (1967); United States v. King, 990 F.2d 1552, 1557

-5-

(10th Cir. 1993).  Second, the officer's action must be "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20; King, 990 F.2d at 1557.

Hodges' claims of error implicate both inquiries: (1) Hodges argues that the police officers' actions were not justified at their inception because the officers lacked reasonable suspicion to conduct an investigatory stop; and (2) Hodges argues that the police officers arrested him without probable cause, thereby exceeding the permissible scope of the investigatory stop, when the officers executed a "high-risk traffic stop" and then handcuffed him.

## A.  Investigatory Stop

In reviewing a district court order denying a motion to suppress, we accept the district court's factual findings unless clearly erroneous, and we view the evidence in the light most favorable to the Government.  United States v. Alcaraz-Arellano, 441 F.3d 1252, 1258 (10th Cir. 2006).  We review de novo the ultimate determination of Fourth Amendment reasonableness.  Id.

The Fourth Amendment protects individuals from "unreasonable searches and seizures," which applies to the States through the Fourteenth Amendment and has been interpreted to include investigatory stops of the kind at issue in this case.  U.S. Const. amend. IV; United States v. Sokolow, 490 U.S. 1, 7 (1989).  As explained by the Supreme Court in United States v. Sokolow, 490 U.S. 1, 7 (1989), Terry v. Ohio, 392 U.S. 1 (1968), "held that the police can stop and

-6-

briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." The Supreme Court has applied this test to investigatory stops because a police officer is not required to "shrug his shoulders and allow a crime to occur or a criminal to escape." Adams v. Williams, 407 U.S. 143, 145 (1972). Instead, "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." Id. at 146.

We evaluate whether reasonable suspicion existed by "consider[ing] the totality of the circumstances to see if the officers have a 'minimal level of objective justification,' something more than an 'inchoate and unparticularized suspicion or hunch" of criminal activity. United States v. Moore, 22 F.3d 241, 243 (10th Cir. 1994). See also Illinois v. Wardlow, 528 U.S. 119, 123-24 (2000); Terry, 392 U.S. at 27 (setting forth this same standard). Officers may form a reasonable suspicion of criminal activity by observing exclusively legal activity so long as the defendant's legal behavior suggests that criminal activity may be afoot. See Wardlow, 528 U.S. at 124-126 (concluding that the officers had reasonable suspicion to conduct an investigatory stop because the defendant was present in a high-crime area and he subsequently fled from the police without provocation).

With these principles in mind, we address the first question presented: whether the officers' investigatory stop of Hodges was supported by reasonable suspicion, based on articulable facts, that criminal activity "may be afoot." See Terry, 392 U.S. at 30. Hodges asserts that the officers' suspicions were based solely on a tip that he possessed a gun, but that such a tip is not sufficient to justify a Terry stop because possessing a gun is not necessarily a crime under Oklahoma law. Aplt. Br. at 10-13 (citing United States v. Ubiles, 224 F.3d 213 (3d Cir. 2000), which suppressed the evidence seized from the defendant because a tip that the defendant possessed a gun, without more, did not create reasonable suspicion). Compare 21 Okl. St. § 1289.13 (making it illegal to carry a loaded firearm in a motor vehicle over a public highway or roadway), with 21 Okl. St. § 1289.7 (making it lawful to carry an unloaded firearm in a motor vehicle). The Government asserts that the high-crime area, the early-morning hour, the information that Hodges used a gun in a threatening manner, and the officers' experience with similar situations supported the officers' belief that Hodges was going to commit a crime. See, e.g., Aplee. Reply Br. at 11.

We hold that Officer Haywood had reasonable suspicion supported by articulable facts that criminal activity "may be afoot" and, at least because of his directive to the other officers, the officers were permitted under the Fourth Amendment to conduct an investigatory stop of Hodges. The precipitating event that generated Officer Haywood's initial suspicion was Mr. Alexander giving him

a tip: Mr. Alexander informed Officer Haywood that Hodges had a firearm in plain view when he threatened Mr. Alexander to get away from his car or there would be trouble. R. at 19. While courts have not always accepted a citizen's tip as sufficient to generate reasonable suspicion, Mr. Alexander's tip is a sufficient basis for reasonable suspicion because the information he provided possessed "an indicia of reliability." Adams, 407 U.S. at 147. See also Illinois v. Gates, 462 U.S. 213, 233 (1983) (stating that "the informant's 'veracity' or 'reliability' and his 'basis of knowledge' . . . [are important factors; however], a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability").

The overall reliability of Mr. Alexander's tip is demonstrated by the considerable detail Mr. Alexander provided to Officer Haywood, the fact that Mr. Alexander honestly identified himself in person before relaying the tip, and the fact that Mr. Alexander identified the silver car about which he was speaking so the officers could immediately begin pursuing Hodges. Cf. United States v. Roch, 5 F.3d 894, 898 (5th Cir. 1993) (finding opposite conclusions about similar factors).

Moreover, the officers testified that they observed sufficient details to corroborate Mr. Alexander's tip. After describing Hodges' threat and the silver car, Mr. Alexander spotted the car and identified it to the officers. Officer White, one of the officers who pulled Hodges over, testified that Hodges accelerated

quickly after Officer White approached him, potentially trying to evade the officers, and did not capitulate for two full blocks. R. at 40.

While it is possible that Hodges' gun was unloaded, Officer Haywood reasonably concluded that the conduct and circumstances of which he was aware supported his judgment that Hodges had engaged or was about to engage in criminal activity. For example, in addition to Mr. Alexander's tip, Officer Haywood also considered the fact that Hodges' conduct took place in a high-crime area at 4:30 a.m. Officer Haywood testified that, based on his experience, criminal activity is likely afoot when an individual threatens another with a gun while present in a high-crime area at 4:30 a.m. See, e.g., R. at 10.

Similarly, Officer White testified that he considered the high-crime area, his experience patrolling the area, his understanding (based on what Mr. Alexander and Officer Haywood told him) that the driver of the silver vehicle had a gun, and the "very heightened awareness" he developed from observing Hodges' evasive behavior. R. at 34, 37, 44. While these factors might not have individually generated reasonable suspicion that criminal activity may be afoot, the totality of the circumstances demonstrates that the officers had reasonable suspicion sufficient to conduct an investigatory stop.[**]

---

[**] The Supreme Court does not require each officer involved to have all the information necessary to generate reasonable suspicion if the officer whom the detaining officer relies upon has reasonable suspicion that criminal activity may be afoot. See United States v. Hensley, 469 U.S. 221, 230 (1985) (stating that
(continued...)

In addition to this obvious possibility that Hodges' threatening behavior portended possible criminal conduct, Officer Haywood reasonably concluded, based on Mr. Alexander's tip and the high-crime area and early-morning hour, that Hodges' gun was loaded—a crime itself in Oklahoma since Hodges possessed the gun in his vehicle. R. at 9-10 (testifying that although he always treats guns as if they are loaded, he *specifically* believed that Hodges' gun was loaded based on several specific factors). See 21 Okl. St. § 1289.13 (making it illegal to carry a loaded firearm in a motor vehicle over a public highway or roadway).

---

[**](...continued) there is no reason why a police department should not be able to act on the basis of a flyer indicating that another department has reasonable suspicion of the suspect's involvement in a crime); Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 568 (1971) (implying that an officer would have had probable cause to arrest a suspect based on a radio bulletin about the suspect if the police who issued the radio bulletin had probable cause, even though the radio bulletin did not specify the evidence that gave the issuing police probable cause); United States v. Shareef, 100 F.3d 1491, 1503 n.4 (10th Cir. 1996) (stating that "[i]t is well-established that when an order to stop . . . a suspect is communicated to officers in the field, the underlying facts constituting . . . reasonable suspicion need not be communicated, so long as the individual . . . issuing the order can justify the intrusion on Fourth Amendment rights").

Officer Haywood had reasonable suspicion that criminal activity may be afoot, and he "direct[ed] Officer White to check out the car" while he detained Mr. Alexander. R. at 8. We note that Officer Haywood even went beyond his mere directive to the other officers when he communicated information about the tip to Officer White. Moreover, Officer White personally knew about this high-crime area, information to corroborate the tip, and Hodges' evasive behavior. We need not decide whether Officer White himself had a reasonable suspicion because his reliance on Officer Haywood's directive, especially when combined with the information Officer Haywood conveyed to him and the information he personally acquired, was sufficient to justify an investigatory stop of Hodges.

-11-

Hodges cites United States v. Ubiles, 224 F.3d 213 (3d Cir. 2000), to support his assertion that his detention violated the Fourth Amendment because Mr. Alexander's tip that he had a gun was not sufficient to generate reasonable suspicion. Hodges' reliance on Ubiles is misplaced. In Ubiles, the police searched the defendant's person after an anonymous tipster informed authorities that the defendant possessed a gun. Id. at 214. Starting with the premise that it was not a crime to possess a gun in the Virgin Islands (where the search took place), the court noted that there was no evidence that the defendant possessed the gun unlawfully, no evidence that the defendant was committing or about to commit a crime, and no evidence that the defendant posed a threat to the officers or anyone in the crowd. Id.

Unlike in Ubiles, however, the officers here acted on more than an anonymous tip that Hodges possessed a gun. Mr. Alexander, who fully identified himself to Officer Haywood, informed the officer that Hodges threatened him with a gun. After Officers White and Ohrynowicz approached Hodges, he quickly accelerated the vehicle he was driving and failed to pull over for two blocks. Moreover, this interaction took place in a high-crime area at 4:30 a.m., unlike Ubiles, where the tip and search occurred in the middle of the morning at a crowded street festival.

Hodges also relies on United States v. Roch, 5 F.3d 894 (5th Cir. 1993), as "a case of interest." Aplt. Br. at 11. In Roch, a police officer received a tip that

-12-

the defendant planned to pass forged checks and kill the next police officer he saw. Id. at 896. The officer then told a Bureau of Alcohol, Tobacco, and Firearms (ATF) agent that the suspect was staying at a certain motel and that he "felt this person was a convicted felon." Id. The police officer and other ATF agents found the defendant and searched his vehicle—a search that yielded a weapon. Id.

The Fifth Circuit held that the search violated the Fourth Amendment. Id. at 899. The court first noted that the police did not observe any activity during their surveillance of the defendant's motel that would support a finding of reasonable suspicion. Id. at 897-98. Although the court recognized that an informant's tip alone may create reasonable suspicion, the court found that the tip at issue was not reliable and that "the criminal activity as to which the defendant sought to raise a reasonable suspicion was that Roch was a felon and possessed a gun. . . . [But] absent any corroboration of Roch's status as a convicted felon, the government had no reasonable suspicion that the criminal activity suggested by the informant was afoot." Id. at 898, 899. Put otherwise, the police lacked reasonable suspicion because the only fact that made the defendant's gun possession illegal was a fact that the officers had not corroborated.

Applying Roch here, Hodges argues that the officers did not have specific information to support their conclusion that his gun was loaded, which he claims is the reason why the officers thought he illegally possessed the gun. Aplt. Br. at

-13-

13. Consequently, Hodges concludes, there was no reason to believe that criminal activity may be afoot and therefore no justification for the investigatory stop. Id.

Hodges oversimplifies the Government's evidentiary showing and inadequately addresses Roch's distinguishable facts. In holding the search unconstitutional, Roch distinguished the Supreme Court's decision to uphold a search in Adams v. Williams, 407 U.S. 143 (1972), because the officers in Adams based their suspicion on a tip that the defendant possessed narcotics, an act that is *per se* illegal. Roch, 5 F.3d at 899. On the contrary, Roch reasoned, the officers in the case before it based their suspicion on their unsupported belief that the defendant was a felon who possessed a firearm. Id. The Roch officers' suspicion was unreasonable because gun possession is not *per se* illegal *and* the officers did not have a sufficient reason to believe that the defendant was a convicted felon. Id.

Hodges' analogy to Roch is deficient in this most important respect: the police officers here made their decision to detain Hodges based upon their experience patrolling this and other high-crime areas in the early morning, their knowledge that Hodges threatened Mr. Alexander with a weapon, and Hodges' evasive behavior, not solely based on an undetailed tip devoid of any reference to the underlying facts that supported the officers' suspicions—as in Roch. Additionally, Hodges' argument incorrectly implies that the officers' only justification for stopping Hodges was their belief that he illegally possessed a

-14-

loaded weapon. As Officer Haywood testified, this was but one basis for his suspicion; the entirely separate basis was that, based on the circumstances noted above (e.g., Hodges' threat, the high-crime area, etc.), "[he] was thinking that there was possibly going to be a robbery or a shooting may happen." R. at 10. While the mere presence of a gun does not necessarily justify such a broad inference, the circumstances here reasonably support the conclusion that other criminal activity, in addition to possession of a loaded weapon in a vehicle, "may be afoot."

In sum, we conclude that Officer Haywood developed reasonable suspicion based on Mr. Alexander's detailed tip that Hodges threatened him with a weapon and on his own experience patrolling high-crime areas in the early morning. Based on Officer Haywood's directive, especially when combined with his communications about the tip to Officer White and Hodges' evasive behavior, Officers White and Ohrynowicz were permitted under the Fourth Amendment to stop Hodges and investigate.

Accordingly, we find no error in the district court's conclusion that the officers' investigatory stop of Hodges passes constitutional muster under the Fourth Amendment.

### B. "High-Risk Traffic Stop" and Handcuffs

Since we hold that the officers were permitted under the Fourth Amendment to conduct an investigatory stop, we must address whether the

officers' actions were "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. If the officers exceeded the limits of the Terry stop, then Hodges' detention became an arrest requiring the support of probable cause. United States v. Neff, 300 F.3d 1217, 1220 (10th Cir. 2002).

Hodges asserts that the officers arrested him because they used a show of authority such that a reasonable person would not have believed he or she was free to leave under the circumstances. Aplt. Br. at 14. Specifically, the police conducted a "high-risk traffic stop," ordered Hodges out of his car, and handcuffed him. The Government asserts that the officers took these precautions based on their reasonable belief that Hodges posed a danger to their safety.

We have repeatedly stated that "a Terry stop does not become unreasonable just because police officers use handcuffs on a subject or place him on the ground." See, e.g., Neff, 300 F.3d at 1220 (citing United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993)). In Neff, the police detained and handcuffed the defendant after receiving a report that the defendant was drunk and walking around with a sawed-off shotgun. Id. at 1219. Although the officers' frisk of the defendant did not reveal a weapon, we noted that "the officers temporarily lost sight of [the defendant] during the pursuit, so it could have been hidden nearby." Id. at 1221. Citing United States v. Shareef, 100 F.3d 1491 (10th Cir. 1996), as illustrating the appropriate analysis, we characterized Shareef as holding that "the

-16-

use of handcuffs was appropriate as long as there was a reasonable, articulable ground for fearing danger from the suspects." Neff, 300 F.3d at 1221.

Applying this standard, we rejected Neff's argument that the detention amounted to an arrest. We explained that, in light of the reliable report that the defendant was armed with a particularly dangerous weapon, the officers were permitted to handcuff the defendant without probable cause because doing so was reasonably necessary to protect the officers' personal safety and to maintain the status quo during the course of the stop. Id. The fact that the record did not reflect that the officers in fact feared for their safety was irrelevant, for we measure a police officer's actions under the Fourth Amendment by looking to the objective facts. Id. at 1222 (citing Maryland v. Macon, 472 U.S. 463, 470 (1985)).

The officers in Shareef were similarly justified in believing that handcuffing the suspects was necessary to ensure the officers' safety. In Shareef, an officer patrolling at 3:30 a.m. stopped three vehicles for speeding, and dispatch subsequently informed the officer, albeit inaccurately, that one of the drivers was wanted on a weapons charge in another State and was considered armed and dangerous. Shareef, 100 F.3d at 1495-97. The police ordered the suspects to exit the vehicles separately, and each suspect was then frisked, handcuffed, and told to kneel on the pavement. Id. at 1497. We held that although this conduct bordered on an illegal arrest, the officers' reasonable belief that the defendants posed a

danger—based on the number of suspects, the time of night, and the information that one of the drivers was a wanted felon—justified the officers' conduct. Id. at 1506.

The officers in the case at bar had a reasonable, articulable ground for fearing danger from Hodges. The officers reasonably believed that Hodges posed a danger—requiring the use of a "high-risk traffic stop" and handcuffs—based on the early-morning hour, the high-crime location, the information that Hodges threatened another individual with a gun, and Hodges' evasive behavior.

Hodges' sole response is that our precedents allowing the use of handcuffs in Terry stops are inconsistent with our precedents holding that an arrest occurs if a reasonable person would have believed he or she was not free to leave under the circumstances. Aplt. Br. at 15. To be sure, there is a fine line between the outer limits of a Terry detention and an arrest requiring probable cause. And officer conduct is surely not immune to challenge when it crosses this fine line. See, e.g., United States v. Melendez-Garcia, 28 F.3d 1046, 1053 (10th Cir. 1994) (holding that the officers arrested the defendant because, among other similar reasons, the officers "had no tips or observations that the suspects were armed or violent" to justify executing a "felony stop"). But converting a Terry detention, which by its terms precludes the suspect from leaving the scene, to an arrest every time an officer uses handcuffs and conducts a "high-risk traffic stop" would conflict with our court's longstanding recognition that the police face a real threat

of danger every time they stop a vehicle.  See, e.g., United States v. Holt, 264 F.3d 1215, 1222 (10th Cir. 2001) (en banc) (stating that "[t]he Supreme Court has found it 'too plain for argument' that the government's interest in officer safety is 'both legitimate and weighty,' given the 'inordinate risks confronting an officer as he approaches a person seated in an automobile"). Moreover, Hodges' argument essentially asks us to overrule the standard explained by Neff and its predecessors, an extraordinary step we cannot take here.

Accordingly, we find no error in the district court's decision that the officers did not exceed the scope of the Terry stop by executing a "high-risk traffic stop" and handcuffing Hodges.  The district court's decision is therefore **AFFIRMED**.


Entered for the Court,


William J. Holloway, Jr.
Circuit Judge